In the

# United States Court of Appeals

## For the Seventh Circuit

No. 20-2105

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JANHOI COLE,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 3:18-cr-30038 — **Richard Mills**, *Judge.*

ARGUED SEPTEMBER 30, 2021 — DECIDED DECEMBER 17, 2021

Before SYKES, *Chief Judge*, and EASTERBROOK, KANNE,
ROVNER, WOOD, HAMILTON, BRENNAN, SCUDDER, ST. EVE, and
KIRSCH, *Circuit Judges.*[*]

---

[*] Circuit Judge Jackson-Akiwumi did not participate in the consideration or decision of this case.

ST. EVE, *Circuit Judge*. An Illinois state trooper stopped Janhoi Cole for following too closely behind another car. At the time, Cole was traveling on an Illinois interstate with an Arizona driver's license and a California registration. During the brief roadside detention that followed, the trooper questioned Cole about his license, registration, and travel plans. Cole's answers struck the trooper as evasive, inconsistent, and improbable. Many of the trooper's questions were follow-up questions to Cole's answers and volunteered information. Combined with other factors, they led the trooper to suspect that Cole was trafficking drugs. To investigate his suspicions, the trooper called for a K-9 unit to meet him and Cole at a nearby gas station. The dog alerted, and officers found large quantities of methamphetamine and heroin in Cole's car.

Facing federal charges, Cole moved to suppress the drugs as well as his statements during the stop. He argued that the trooper unlawfully initiated the stop and unreasonably prolonged it without reasonable suspicion of other criminal activity. The district court denied the motion, but a divided panel of this Court reversed on the basis that the trooper's initial roadside questioning unreasonably prolonged the traffic stop. We reheard the case en banc to resolve an apparent conflict between the panel's decision and *United States v. Lewis*, 920 F.3d 483 (7th Cir. 2019), as to whether travel-plan questions are part of the "mission" of a traffic stop under *Rodriguez v. United States*, 575 U.S. 348 (2015).

In keeping with *Lewis* and the consensus of other circuits, we hold that travel-plan questions ordinarily fall within the mission of a traffic stop. Travel-plan questions, however, like other police inquiries during a traffic stop, must be reasonable under the circumstances. And here they were. The trooper

inquired about the basic details of Cole's travel, and his follow-up questions were justified given Cole's less-than-forthright answers. The stop itself was lawfully initiated, and the trooper developed reasonable suspicion of other criminal activity before moving the initial stop to the gas station for the dog sniff. We therefore affirm the district court's denial of Cole's motion to suppress.

## I.

A magistrate judge held a hearing on Cole's motion to suppress. Evidence at the hearing included the trooper's police report and dash camera video as well as testimony from Cole, the trooper, and another officer involved in the stop. After the hearing, the magistrate judge entered a report and recommendation with extensive factual findings, which the district court adopted. Absent clear error, we defer to the district court's factual findings. *United States v. Bacon*, 991 F.3d 835, 840 (7th Cir. 2021).

## A.

Sheriff's Deputy Derek Suttles was on criminal interdiction patrol in central Illinois when he spotted a silver Volkswagen hatchback traveling east on the interstate. The car caught his attention because it was travelling 10 to 15 miles below the posted speed limit. Deputy Suttles also noticed a covering over the car's rear cargo area. He messaged Illinois State Police Trooper Clayton Chapman, who was doing criminal interdiction patrol further east on the interstate, and told him to look out for the Volkswagen. Trooper Chapman had about 250 hours of training, mostly related to drug interdiction and other crime interdiction on roadways.

Deputy Suttles relayed the information that he considered to be suspicious, along with the results of a license plate check. The check revealed that the Volkswagen had been sold and registered three weeks earlier to Janhoi Cole, with an address in Los Angeles, California. It had been insured only four days earlier.

Trooper Chapman spotted the Volkswagen, whose driver was leaned far back in the seat with his arms fully extended, obscuring his face, and began following the vehicle. Shortly thereafter, Trooper Chapman saw another car merge in front of the Volkswagen from the far-left lane. When the other car merged, the Volkswagen did not move into the right lane, but instead followed closely behind the merged car. From his vantage point—about a football field behind the Volkswagen—Trooper Chapman determined that the Volkswagen was two car lengths or less behind the merged car.

Trooper Chapman stopped the Volkswagen for following too closely, in violation of Illinois law. *See* 625 ILCS 5/11-710(a). After calling in the license plate and confirming that the plate matched the car, Trooper Chapman approached the Volkswagen and asked the driver (Cole) for his license and registration. Cole produced his Arizona driver's license and California registration. In response to Trooper Chapman's questions, Cole confirmed that his license showed his current address and that he owned the Volkswagen. Trooper Chapman then asked Cole to sit in his squad car so he could explain the purpose of the stop in a quieter and safer setting. While standing by Cole's car, Trooper Chapman saw numerous drinks and snacks in the car, which led him to believe that Cole had been traveling long distances. He observed, though, that the only luggage in the car was a small backpack.

In the squad car, Trooper Chapman spent about a minute explaining the details of how Cole had followed the other car too closely. He then asked Cole about his Arizona driver's license and California license plate. Cole offered, "I'm a chef. I spend most of my time between Los Angeles and Maryland and New York at work. But I genuinely had a job in Arizona. And I genuinely keep this driver's license because of the expiration date."

About four minutes into the stop, Trooper Chapman began inquiring into Cole's travel plans. He first asked where Cole was headed. Cole answered, Maryland, because his boss resided in Maryland. Following up, the trooper asked where Cole worked and for whom. Cole responded that he was a personal chef for two former professional football players and, in between, an ordinary chef. After confirming Cole's destination (Maryland), the trooper asked Cole where his trip began. Cole did not answer the question initially. Instead, he offered that he had met up with some friends and family in Colorado Springs. The trooper asked again where the trip began. Cole clarified that his trip started in Maryland. From there, he went to Cincinnati, before heading to Colorado Springs, then Boulder, and was going back home to Maryland when the trooper stopped him. The trooper asked Cole when he left on the trip. Cole said about four to five days earlier.

The trooper then moved on to the vehicle's information. He questioned Cole as to how long he had owned the Volkswagen. Cole said six months, adding that he just had the paperwork transferred. He explained that the car was a recent purchase. He had been driving with his friend's paperwork and had only recently acquired the insurance and registration. Looking at Cole's paperwork, the trooper noted that the

car had been registered on June 4, 2018. Cole verified that was correct; his girlfriend had registered the car then.

Trooper Chapman next inquired where Cole was living. Cole said he spent most of his time in Los Angeles, adding that he had a child in both Los Angeles and Florida and was planning to move to Florida. The trooper wondered, "So, you've got an Arizona driver's license that says Tucson … I'm just trying to … And you said you've been traveling from Maryland, so have you been staying recently in Maryland?" Cole replied, "Yes. I have family in Maryland. My boss is in Maryland. When I work in Maryland, I stay by my uncle. But this driver's license, I genuinely keep it just because of the expiration. I haven't been in Arizona in a long time." The trooper followed up, "So your primary address, or your current address, is in California. But recently you've been staying in …." Before he could finish, Cole interjected, "Yeah, cause I'm a chef. I travel." The trooper asked, "Back and forth?" Cole said yes, explaining that he went wherever he got jobs. The trooper concluded by asking Cole why he did not fly. Cole responded, "Fly? I have a car. And I travel with pots sometimes. I'm a chef. Occasionally I travel with a bicycle."

Trooper Chapman thought that Cole's travel details sounded vague and made up. Cole appeared extremely nervous during the stop. Among other physical symptoms, he was breathing heavily, and his neck was sweaty.

Less than nine minutes into the stop, Trooper Chapman told Cole that he was going to issue him a warning. He explained, though, that they would have to relocate to a nearby gas station for safety reasons. Cole returned to his own car, and they drove separately to the gas station. At the gas station, Trooper Chapman called for a K-9 unit. While waiting,

Trooper Chapman continued questioning Cole about his travel plans. He regarded Cole's answers as increasingly suspicious. He also learned from dispatch that Cole had been arrested three times on drug trafficking charges. About 45 minutes after the stop began, the K-9 unit alerted on Cole's car. Officers searched the car and found large quantities of methamphetamine and heroin.

**B.**

A federal grand jury charged Cole with possession with intent to distribute 500 grams or more of methamphetamine (Count 1) and heroin (Count 2). Cole moved to suppress the drugs found in his car and his statements during the stop. The magistrate judge recommended denying the motion. The district court accepted the recommendation and denied the motion. Cole conditionally pleaded guilty to both counts, while reserving his right to appeal the denial of his motion to suppress. A divided panel of this Court reversed, but we vacated that opinion and voted to rehear the case en banc.

**II.**

Cole maintains that Trooper Chapman violated his Fourth Amendment rights by stopping him without reasonable suspicion of a traffic violation and by unreasonably prolonging the stop to inquire into his travel plans. We review the district court's legal conclusions de novo, *Bacon*, 991 F.3d at 840, and its factual findings for clear error, *United States v. Gholston*, 1 F.4th 492, 496 (7th Cir. 2021).

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. Time and again, the

Supreme Court has held that "the ultimate touchstone of the Fourth Amendment is reasonableness." *Lange v. California*, 141 S. Ct. 2011, 2017 (2021) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). "Reasonableness, in turn, is measured in objective terms by examining the totality of the circumstances." *Ohio v. Robinette*, 519 U.S. 33, 39 (1996).

Traffic stops are seizures, so they must be reasonable under the circumstances. *Whren v. United States*, 517 U.S. 806, 809 (1996). To be reasonable, a traffic stop must be "justified at its inception, and reasonably related in scope to the circumstances which justified the interference in the first place." *Hiibel v. Sixth Jud. Dist. Ct. of Nevada, Humboldt Cnty.*, 542 U.S. 177, 185 (2004). Because traffic stops are typically brief detentions, more akin to *Terry* stops than formal arrests, they require only reasonable suspicion of a traffic violation—not probable cause. *Rodriguez*, 575 U.S. at 354; *Navarette v. California*, 572 U.S. 393, 396–97 (2014); *see also Terry v. Ohio*, 392 U.S. 1 (1968). By the same token, though, traffic stops must remain limited in scope: "A seizure for a traffic violation justifies a police investigation of that violation." *Rodriguez*, 575 U.S. at 354. Police may not "detour[]" from that "mission" to investigate other criminal activity. *Id.* at 356–57. A detour that "prolongs the stop" violates the Fourth Amendment unless the officer has reasonable suspicion of other criminal activity to independently justify prolonging the stop. *Id.* at 355.

## A.

The first issue we address is whether Trooper Chapman had a lawful basis to initiate the stop.[1] We have little trouble

---

[1] We, of course, do not consider Trooper Chapman's subjective motivations for deciding to conduct a traffic stop. As the Supreme Court has

concluding that he did. Under Illinois law, "[t]he driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway." 625 ILCS 5/11-710(a). Trooper Chapman testified that Cole was less than two car lengths behind the car in front of him. The magistrate judge credited that testimony and made an express factual finding that Cole was following too closely behind the other car. Cole does not challenge that factual finding on appeal. Instead, he argues that the district court failed to consider the statutory factors (speed of other cars, traffic, and road conditions) when determining that there was reasonable suspicion of a traffic violation. The question, however, is whether Trooper Chapman reasonably believed that he saw a traffic violation, not whether Cole actually violated the statute. *United States v. Muriel*, 418 F.3d 720, 724 (7th Cir. 2005); *see also United States v. Simon*, 937 F.3d 820, 829 (7th Cir. 2019) ("If an officer reasonably thinks he sees a driver commit a traffic infraction, that is a sufficient basis to pull him over without violating the Constitution."). As in *Muriel*, the trooper's "estimation" of a short following distance justified the stop. *Muriel*, 418 F.3d at 724; *accord Lewis*, 920 F.3d at 490.

---

unequivocally held, "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren*, 517 U.S. at 813. To the extent that the dissent opposes the objective test established by *Whren*, or suggests that police discretion informs how courts should approach Fourth Amendment law more generally, that is an issue for the Supreme Court, not us.

**B.**

The more substantial issue is whether Trooper Chapman unlawfully prolonged the traffic stop by inquiring about Cole's itinerary.

**1.**

To answer this question, we start with *Rodriguez*. There, the Supreme Court held that "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission.'" *Rodriguez*, 575 U.S. at 354 (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). The mission of a traffic stop, in turn, is "to address the traffic violation that warranted the stop and attend to related safety concerns." *Id.* (citations omitted). Tasks within that mission include "determining whether to issue a traffic ticket" and pursuing "'ordinary inquiries incident to [the traffic] stop.'" *Id.* at 355 (quoting *Caballes*, 543 U.S. at 408). Typically, the ordinary inquiries incident to a traffic stop "involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* Such inquiries fall within the mission of a stop because they "serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." *Id. Rodriguez* distinguished those ordinary inquiries from measures aimed at investigating other criminal activity, such as a dog sniff for drugs. *Id.*

As part of making these ordinary inquiries, no one disputes that an officer may ask questions unrelated to the stop, and even conduct a dog sniff, if doing so does not prolong the traffic stop. As the Supreme Court explained in *Arizona v. Johnson*, 555 U.S. 323 (2009), "[a]n officer's inquiries into

matters unrelated to the justification for the traffic stop … do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Id.* at 333; *see Rodriguez*, 575 U.S. at 354–55; *Caballes*, 543 U.S. at 408 (dog sniff). This recognition does not resolve this appeal because the record is undeveloped as to whether Trooper Chapman's travel-plan questions prolonged the stop. If they did not, then they would have been permissible even if they exceeded the mission of the stop. *See Lewis*, 920 F.3d at 492; *United States v. Walton*, 827 F.3d 682, 687 (7th Cir. 2016). But because the district court never made such a factual finding, we put this issue aside and ask whether Trooper Chapman's travel-plan questions fell within the mission of the stop, such that they could not have prolonged it in the first place.

*Rodriguez* did not list travel-plan questions among the ordinary inquiries of a traffic stop. *See Rodriguez*, 575 U.S. at 351. From this, Cole infers that the Supreme Court must have meant to exclude them. Judicial opinions are not statutes, however, and we decline to extrapolate a holding about travel-plan questions from the Supreme Court's silence on them in a case where they were not at issue. *See United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc). The question presented in *Rodriguez* was "whether the Fourth Amendment tolerates a dog sniff conducted after completion of a traffic stop." *Rodriguez*, 575 U.S. at 350. The Court had no occasion to reach—and did not reach—the propriety and permissible scope of travel-plan questions. We decline to read *Rodriguez* as creating an exhaustive list of mission-related inquiries. *See United States v. Gholston*, 1 F.4th 492, 496 (7th Cir. 2021) (noting that "[a] stop may call for a variety of measures beyond" the ordinary inquiries listed in *Rodriguez*).

Though *Rodriguez* did not address whether travel-plan questions fall within the mission of a traffic stop, it supplied an analytical framework for answering that question. Namely, we must ask whether, in the totality of circumstances, reasonable travel-plan questions, like the other ordinary inquiries of a stop, are justified by the traffic violation itself or by the "related" concerns of "[h]ighway and officer safety." *Rodriguez*, 575 U.S. at 354, 356–57. Our sister circuits have followed this approach in deciding whether other unlisted inquiries fall within the mission of a traffic stop. *See, e.g.,* *United States v. Buzzard*, 1 F.4th 198, 203–04 (4th Cir. 2021); *United States v. Clark*, 902 F.3d 404, 410–11 (3d Cir. 2018); *United States v. Evans*, 786 F.3d 779, 786–87 (9th Cir. 2015).

Applying the *Rodriguez* framework, we hold that travel-plan questions ordinarily fall within the mission of a traffic stop. To begin, travel-plan questions supply important context for the violation at hand. If, for example, "a given driver was speeding in order to get his pregnant wife to the hospital," then perhaps this "extenuating circumstance" might persuade the officer to issue a warning or simply release the driver. *United States v. Brigham*, 382 F.3d 500, 508 & n.6 (5th Cir. 2004) (en banc); *accord United States v. Cortez*, 965 F.3d 827, 839 (10th Cir. 2020) (reasoning that officer's travel-plan questions "could cast light on why Cortez had been speeding, tying them to the initial justification for the stop"). In other circumstances, the context of a stop might counsel in favor of a ticket or arrest. *See Brigham*, 382 F.3d at 508 & n.6.

A driver's travel plans may also inform an officer's assessment of roadway safety concerns beyond the immediate violation. An officer investigating a broken taillight, for example, has a legitimate interest in knowing whether the driver is two

miles from home or halfway through a cross-country trip. *Cf. United States v. Ellis*, 497 F.3d 606, 613–14 (6th Cir. 2007) (holding that officer who stopped car for weaving "was justified in asking the occupants general questions of who, what, where, and why regarding their 3:23 a.m. travel," as such questions could help "determine the driver's ability to safely operate the vehicle").

At a more general level, "[t]ravel plans typically are related to the purpose of a traffic stop because the motorist is traveling at the time of the stop." *United States v. Holt*, 264 F.3d 1215, 1221 (10th Cir. 2001) (en banc), *abrogated on other grounds as recognized in Cortez*, 965 F.3d at 839; *see also United States v. Collazo*, 818 F.3d 247, 258 (6th Cir. 2016) (describing travel-plan questions as "classic context-framing questions directed at the driver's conduct at the time of the stop" (quoting *United States v. Lyons*, 687 F.3d 754, 770 (6th Cir. 2012))). In that sense, travel-plan questions comport with the "public's expectations regarding ordinary inquiries incidental to traffic stops." *Cortez*, 965 F.3d at 839.

In short, travel-plan questions are routine inquiries that reasonably relate to the underlying traffic violation and roadway safety. As a result, we hold that such questions ordinarily fall within the mission of a traffic stop. This does not mean, however, that officers have a free pass to ask travel-plan questions until they are subjectively satisfied with the answers. An officer's travel-plan questions, like the officer's other actions during the stop, must remain reasonable, and reasonableness is an objective standard based on all the circumstances. *Robinette*, 519 U.S. at 39.

We are not alone in holding that travel-plan questions ordinarily fall within the mission of a traffic stop. In fact, every

circuit to address the issue post-*Rodriguez* has reached the same conclusion. Most recently, the Eleventh Circuit rejected a defendant's argument that an officer's travel-plan questions went beyond the mission of a stop, holding that "[g]enerally, questions related to an individual's traffic plans or itinerary are ordinary inquires related to a traffic stop." *United States v. Braddy*, 11 F.4th 1298, 1311 (11th Cir. 2021). Five other circuits agree. *Cortez*, 965 F.3d at 838 ("An officer may … inquire about the driver's travel plans."); *United States v. Garner*, 961 F.3d 264, 271 (3d Cir. 2020) ("[S]ome questions relating to a driver's travel plans ordinarily fall within the scope of the traffic stop."); *United States v. Smith*, 952 F.3d 642, 647 (5th Cir. 2020) (observing that an officer "may … ask about the purpose and itinerary of the occupants' trip" (quoting *Brigham*, 382 F.3d at 508)); *United States v. Dion*, 859 F.3d 114, 125 (1st Cir. 2017) ("[O]ur case law allows an officer carrying out a routine traffic stop to … inquire into the driver's itinerary."); *Collazo*, 818 F.3d at 258 ("Questions relating to travel plans … rarely offend our Fourth Amendment jurisprudence." (quoting *Lyons*, 687 F.3d at 770)); *see also United States v. Callison*, 2 F.4th 1128, 1131 n.2 (8th Cir. 2021) (noting that "[i]n some post-*Rodriguez* cases we have at least suggested that travel-related questions remain a 'permissible' part of routine traffic stops in the Eighth Circuit." (citing *United States v. Murillo-Salgado*, 854 F.3d 407, 415 (8th Cir. 2017))).

The dissent claims that the Tenth Circuit has taken a more nuanced approach to travel-related questions in *United States v. Gomez-Arzate*. 981 F.3d 832 (10th Cir. 2020). In *Gomez-Arzate*, however, the officers' travel-plan questions came *after* the traffic stop was completed, in contrast to the questions from Trooper Chapman that occurred *during* the traffic stop. *Id.* at 840 n.3 ("Here, though, the traffic stop had effectively been

completed before the VIN search and questioning about travel plans.").

We, too, have approved of travel-plan questions post-*Rodriguez*. In *Lewis*, the defendant complained that an officer spent several minutes "asking about irrelevant travel matters" during a traffic stop, thereby prolonging the stop in violation of the rule announced in *Rodriguez*. 920 F.3d at 492. We rejected the argument. To begin, we dismissed the idea that the officer's first question—"Where are we headed to today, sir?"—was unrelated to the stop, remarking that "[o]fficers across the country would be surprised if we countenanced the characterization of this basic, routine question as irrelevant to a traffic stop." *Id.* Lewis's response to the officer's first question was "not entirely forthcoming," and prompted the officer to ask several follow-up questions. Lewis answered these questions in a similarly evasive manner. Again, adhering to the rule announced in *Rodriguez*, we squarely rejected Lewis's argument that the officer's travel-plan questions were impermissible: "The Constitution allows an officer to ask these questions during a traffic stop, especially when the answers objectively seem suspicious."[2] *Id.*

*Lewis* reinforces an important corollary of our holding: Officers asking travel-plan questions may also ask reasonable follow-up questions based on a driver's responses. Travel-plan questions are not mere formalities; they serve important

---

[2] The dissent attempts to recast *Lewis*, asserting that "the most important reason [we] had for affirming denial of the motion to suppress there was that the defendant had simply failed as a matter of fact to show that the questioning had actually prolonged the stop." But that reading contradicts the opinion's unambiguous language. *Lewis*, 920 F.3d at 492.

law-enforcement purposes, and therefore an officer has an interest not only in asking such questions but also in receiving truthful answers to them. If a driver's responses are evasive, inconsistent, or improbable, the officer need not accept them at face value and move on. To the contrary, the officer may ask reasonable follow-up questions to clarify the answers. This was our point in *Lewis*, when we said the Fourth Amendment permits travel-plan questions during traffic stops "especially when the answers objectively seem suspicious." *Id.*; *see also Murillo-Salgado*, 854 F.3d at 415 (holding that an officer may take the time to respond to "legitimate complications" that arise during the "routine tasks" of a traffic stop); *Dion*, 859 F.3d at 124–25 (explaining that a *Terry* stop is not a "snapshot of events frozen in time and place" and that an officer's "actions must be fairly responsive to the emerging tableau" (internal quotation and citation omitted)). It is only when an officer's follow-up questions go too far and become unreasonable that a stop risks becoming prolonged.

**2.**

Applying these principles here, we hold that Trooper Chapman's travel-plan questions during the initial roadside detention fell within the mission of the traffic stop and did not unlawfully prolong the traffic stop.

At the outset, it is important to recall the sequence of events here. Trooper Chapman asked his travel-plan questions following Cole's elusive and confusing account. These travel-plan questions related closely to his questions about Cole's Arizona license and California registration. *See Braddy*, 11 F.4th at 1311 (holding that the officer's questions about license, registration, and travel plans were within the mission of stop). Before inquiring into Cole's travel, Trooper

Chapman asked Cole about the discrepancy between his Arizona license and California registration. Cole's response referenced three other states beyond Arizona and California. He explained that he was a chef who split his time between Los Angeles, Maryland, and New York, adding that he kept his Arizona license because of the expiration date and that he might be moving to Florida soon. When Trooper Chapman began generally inquiring about Cole's travel details, Cole added two more states into the mix: He said he had stopped in Cincinnati on his way from Maryland to Colorado. By this point, Cole had mentioned seven different states—none of which was Illinois—in response to Trooper Chapman's questions about his license, registration, and basic trip details. *See id.* (holding that the officer's travel-plan questions were "ordinary inquiries related to the traffic stop, especially given the fact that Braddy was driving a vehicle on Alabama roads with an obstructed Florida license plate that was not registered to him").

Understandably, Trooper Chapman had follow-up questions. Cole evaded some of these follow-up questions. After Cole volunteered that he worked as a chef, for example, Trooper Chapman asked where he worked. Cole replied with his occupation, saying he was a personal chef. Trooper Chapman tried asking the same question another way: "Who do you work for?" This time, Cole responded that he worked for two former professional football players and that "in between" he was a chef. Cole similarly evaded Trooper Chapman's question about where he began his trip, prompting Trooper Chapman to repeat the question. Cole's explanation for where he was currently living was also hard to pin down. Initially, he said he spent most of his time in Los Angeles, while noting that he might be moving to Florida. When

Trooper Chapman followed up, however, Cole seemed to agree that he was currently living in Maryland. In addition to evading questions, Cole gave confusing and improbable answers that prompted other reasonable follow-up questions. *See Dion*, 859 F.3d at 125–26 (where driver with Colorado plates produced an Arizona license and "described his travel itinerary as a return trip from a cross-country road trip to visit a CPA in Pennsylvania," an officer's follow-up questions on the same subject were "both prompted and warranted" by that "odd answer to a concededly appropriate question about travel itinerary").

Under these circumstances, Trooper Chapman's travel-plan questions were reasonable. Trooper Chapman questioned Cole about the basic details of his travel—which were relevant to the traffic violation and roadway safety—and asked reasonable follow-up questions based on Cole's elusive answers. *See Lewis*, 920 F.3d at 492. As Trooper Chapman testified, his questions were aimed at "piec[ing] together" Cole's "inconsistent" answers to basic travel-plan questions. He was not, as Cole suggests, conducting a "fishing expedition" for information that might generate reasonable suspicion to prolong the stop. *Dion*, 859 F.3d at 128 n.12 (citing *United States v. Pruitt*, 174 F.3d 1215, 1221 (11th Cir. 1999)); *cf. Cortez*, 965 F.3d at 840 (holding that "repetitive" and "in depth" questions about travel details were unrelated to traffic stop because such questions "neither helped investigate the original infraction—speeding—nor could they reasonably be characterized as relating to officer safety"); *United States v. Macias*, 658 F.3d 509, 519 (5th Cir. 2011) (holding that officer's detailed questions about driver's mother, children, and past encounters with law enforcement went beyond mission of stop because they bore no relation to driver's failure to wear a seatbelt).

Cole complains that Trooper Chapman's questions went beyond the details of his travel and into unrelated matters, such as his occupation. But Cole initially volunteered his occupation almost three minutes into the stop in response to a question about his license and registration and repeatedly returned to it when explaining his travel and living situation, so it was reasonable for Trooper Chapman to ask a few follow-up questions about it. Cole also complains about the length of Trooper Chapman's travel-plan questions (just under five minutes). But "we repeatedly have declined to adopt even a rule of thumb that relies on the number of minutes any given stop lasts." *Gholston*, 1 F.4th at 496 n.4. Reasonableness is the touchstone, and what is reasonable depends on the circumstances of a case. *Lange*, 141 S. Ct. at 2017. Here, Trooper Chapman's questioning stayed within reasonable limits given Cole's responses.

Because Trooper Chapman's questioning was reasonable, we need not speculate about scenarios in which travel-plan questions might go too far. For now, it is enough to say that travel-plan questions go too far when they are no longer reasonably related to the stop itself (and related safety concerns) but rather reflect an independent investigation of other criminal activity. *See Rodriguez*, 575 U.S. at 356–57.

**3.**

We do not address whether Trooper Chapman's additional questions at the gas station stayed within the mission of the stop because he developed reasonable suspicion of other criminal activity less than nine minutes into the stop, before he told Cole he would issue him a warning and before they drove to the gas station.

Reasonable suspicion exists when, considering the totality of the circumstances, an officer has "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Navarette*, 572 U.S. at 396–97 (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)). A hunch is not enough, but "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Arvizu*, 534 U.S. 266, 274 (2002). The standard "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Id.* at 273 (quoting *Cortez*, 449 U.S. at 418).

This standard was met here. Cole was driving on an Illinois interstate with an Arizona driver's license and a California registration, and his explanation for this discrepancy was confusing at best. According to Cole, he was a traveling personal chef who split his time between California, Maryland, and New York, traveling to each destination by car so that he could bring his pots and bicycle with him. He claimed to have had a job at one point in Arizona, and he added that he might be moving to Florida soon, again for job-related reasons. Even if this story was not inconceivable, Trooper Chapman reasonably suspected that it was false. *See Walton*, 827 F.3d at 688–89 (finding reasonable suspicion based in part on defendant's "implausible" answers).

The details of Cole's current trip were equally dubious and seemed to evolve throughout the conversation. In Cole's telling, he had driven from Maryland to Cincinnati to multiple locations in Colorado and then to Illinois on his way back to

Maryland—all in just four or five days. He originally said he spent two of the four days in Cincinnati for work, but he quickly changed his answer and said he just passed through Cincinnati. His story about Colorado also seemed to evolve. Initially, he said he met friends and family in "the springs." Then, he said he met some friends at the Springs and went to Boulder to visit a buddy. After that, he said he met some friends in Colorado because one of them was getting a divorce. Cole's improbable and inconsistent answers about his trip details reasonably increased Trooper Chapman's suspicions. *See Lewis*, 920 F.3d at 493 (finding reasonable suspicion based in part on defendant's "suspiciously inconsistent" answers).

Cole's extreme nervousness reinforced the suspicion. *See United States v. Rodriguez-Escalera*, 884 F.3d 661, 669 (7th Cir. 2018) ("[N]ervousness is certainly a factor that can support reasonable suspicion."). Trooper Chapman testified that Cole was "extremely nervous" throughout the stop, adding that his neck was sweaty and that he was breathing heavily. Cole suggests that the dash camera video refutes this testimony, but the dash camera was not pointed at Cole during the conversation. Moreover, the dash camera records Cole himself commenting on how nervous he was, so if anything, it supports Trooper Chapman's testimony. Cole cannot show that the district court's finding of extreme nervousness was clearly erroneous. *See id.* (holding that the district court did not have to credit officer's testimony that defendant was nervous "when the court's own review of the traffic stop footage led it to the opposite conclusion").

Additional factors further supported Trooper Chapman's belief that Cole was engaged in criminal activity. Cole's car

was newly registered and insured. Trooper Chapman found this suspicious because he knew that drug traffickers often traded and reregistered cars and purchased insurance for specific trips rather than maintaining permanent insurance. Cole disputes the district court's finding that Trooper Chapman possessed this knowledge. But Deputy Suttles's message to Trooper Chapman provided the car's most recent registration date, and Cole, himself, told Trooper Chapman that he recently acquired the "insurance, registration, and all that stuff." So here too, Cole has not shown clear error. In addition to the recent registration and insurance purchase, Trooper Chapman knew from Deputy Suttles that Cole had a covering over his rear cargo area, which was common among persons engaged in criminal activity. Finally, Trooper Chapman noticed that Cole had limited luggage in his car—one small backpack—which was hard to square with Cole's cross-country road trip.

Taken together and assessing the totality of the circumstances known to Trooper Chapman, these factors created reasonable suspicion that Cole was engaged in criminal activity. We need not consider the other factors that the government relies on—*e.g.*, the make of Cole's car (a Volkswagen), Cole's origin in Los Angeles (a supposed drug source location), his travel on Interstate-55 (a supposed drug corridor), and his slow speed and rigid driving posture—though we remind the government to refrain from using criteria so broad as to subject "a very large category of presumably innocent travelers" to "virtually random seizures." *Reid v. Georgia*, 448 U.S. 438, 441 (1980); *see also United States v. Street*, 917 F.3d 586, 594 (7th Cir. 2019) ("Without more, a description that applies to large numbers of people will not justify the seizure of a particular individual.").

Because Trooper Chapman developed reasonable suspicion less than nine minutes into the stop, during the initial roadside detention, he had a lawful basis for prolonging the stop to conduct a dog sniff at the gas station, where Cole's increasingly incoherent answers and criminal history further increased his suspicions. *See Rodriguez*, 575 U.S. at 355.

### III.

The trooper's actions in this case complied with the Fourth Amendment, so we AFFIRM the district court's denial of Cole's motion to suppress.

HAMILTON, *Circuit Judge*, joined by ROVNER and WOOD, *Circuit Judges,* dissenting. A broken taillight, a too-sudden lane change, or tailgating for a few seconds allows a police officer to carry out a traffic stop even if the officer's real purpose is to investigate other possible crimes. In such stops, no one sees a problem with an officer's question or two about where the driver is coming from or going. Answers to those questions may help the officer understand the situation and assess the driver's attitude and potential threats. The majority's decision today errs, however, by going much further. Under the majority opinion, the officer may also subject a driver and passengers to repetitive and detailed questioning about where they are coming from and where they are going *until the officer is satisfied that the answers are truthful*. Ante at 15–16. Given the low "hit rate" of police searches of vehicles for drugs, this decision will enable police officers to harass and humiliate civilians far more often than they actually turn up significant quantities of drugs.

The scope of permissible police activity in pretextual traffic stops is important. By adopting a general presumption allowing such detailed interrogation as occurred in this case, the majority enables police officers to subject almost any motorist to similar interrogation, delay, and even humiliation, for little gain in terms of law enforcement. See Jeannine Bell, *The Violence of Nosy Questions*, 100 B.U. L. Rev. 935 (2020) (criticizing wide discretion for officers to ask "nosy" questions on fishing expeditions that humiliate and anger drivers stopped for minor traffic infractions).

This case presents a pretextual traffic stop based on a police officer's hunch that the car was carrying drugs. The video recording and the officer's later testimony show that, almost

from the very outset, the officer prolonged the stop by questioning the driver at length and in detail on subjects beyond the legal justification for the stop. Under *Rodriguez v. United States*, 575 U.S. 348 (2015), the officer's prolonging of this stop violated the Fourth Amendment. We should order suppression of evidence found later in the stop.

To be sure, in some traffic stops, some questions about travel plans will be relevant. For example, an officer who has reason to believe the driver is impaired by fatigue will want to know how long the driver has been on the road. In such cases, an officer should have little difficulty explaining his questioning in terms of the lawful purpose of the stop. This stop for tailgating was not such a stop, and the officer offered no such lawful explanation. I respectfully dissent.

To explain my conclusion, Part I of this opinion outlines the legal doctrines allowing pretextual stops and their well-known consequences. Part II lays out important limits the Supreme Court has imposed on such pretextual traffic stops, in terms of both time and the activities an officer may engage in unless and until he develops at least reasonable suspicion of some criminal activity. Part III explains why the traffic stop of defendant Janhoi Cole was prolonged in violation of the Fourth Amendment. Part IV identifies further problems in the majority's decision. Part V concludes with some suggestions for going forward in similar cases.

I.  *Pretextual Traffic Stops and Their Effects*

In *Whren v. United States*, 517 U.S. 806 (1996), the Supreme Court held that the reasonableness of a traffic stop under the Fourth Amendment must be decided using an objective standard, not the officer's actual purposes. *Whren* thus gave

police officers wide latitude to stop vehicles for reasons having nothing to do with the traffic laws that provide lawful pretexts for the stops.

Many of those traffic laws also give an officer considerable room for judgment and discretion in applying them. In this case, for example, the stop was justified based on a perceived violation of this law: "The driver of a motor vehicle shall not follow another vehicle more closely than is *reasonable and prudent*, having *due regard* for the speed of such vehicles and the traffic upon and the condition of the highway." 625 ILCS 5/11-710(a) (emphasis added). Extending that discretion even further, courts will uphold a traffic stop based on not only the actual facts and law but even an officer's reasonable mistake of fact or law. *Heien v. North Carolina*, 574 U.S. 54, 61 (2014).

The combination of the objective test under *Whren*, the number and detail of traffic laws, and the discretion inherent in applying those laws gives police officers the power to stop nearly any vehicle if they watch it for more than a few minutes. See David A. Harris, *"Driving While Black" and All Other Traffic Offenses: The Supreme Court and Pretextual Traffic Stops*, 87 J. Crim. L. & Criminology 544, 545, 558–59 (1997) ("In the most literal sense, no driver can avoid violating some traffic law during a short drive, even with the most careful attention;" "with the traffic code in hand, any officer can stop any driver any time"); Barbara C. Salken, *The General Warrant of the Twentieth Century? A Fourth Amendment Solution to Unchecked Discretion to Arrest for Traffic Offenses*, 62 Temp. L. Rev. 221, 223 (1989) ("The innumerable rules and regulations governing vehicular travel make it difficult not to violate one of them at one time or another."). As then-Attorney General Robert Jackson said long ago, "We know that no local police

force can strictly enforce the traffic laws, or it would arrest half the driving population on any given morning." Robert Jackson, *The Federal Prosecutor, Address Delivered at the Second Annual Conference of United States Attorneys* (April 1, 1940), quoted in *Morrison v. Olson*, 487 U.S. 654, 727–28 (1988) (Scalia, J., dissenting).

The phrase "Driving While Black" reflects long recognition of how *Whren* enables racially discriminatory stops and searches. See, e.g., Tracey Maclin, *Cops and Cars: How the Automobile Drove Fourth Amendment Law*, 99 B.U. L. Rev. 2317, 2347–49 (2019); David A. Harris, *Profiles in Injustice: Why Racial Profiling Cannot Work* 30 (2002); David A. Sklansky, *Traffic Stops, Minority Motorists, and the Future of the Fourth Amendment*, 1997 Sup. Ct. Rev. 271, 308–16.

These police tactics subject large numbers of innocent drivers to this sort of harassment and humiliation for minimal gains in drug interdiction. For judges who see these tactics primarily in criminal prosecutions in the rare cases where dealer quantities of drugs were found, it's easy to lose sight of this reality. Empirical studies based on millions of traffic stops show: (1) that police departments have exploited *Whren* to carry out pretextual stops on a massive scale; (2) that Black and Hispanic drivers are subjected to such stops and ensuing searches at substantially higher rates than white drivers; and (3) that pretextual stops rarely find drugs, let alone dealer quantities of drugs. The empirical studies have used statistical methods to control for variables other than racial profiling, and the disparities remain dramatic. E.g., Emma Pierson et al., *A Large-Scale Analysis of Racial Disparities in Police Stops Across the United States*, 4 Nature Human Behavior 736 (2020) (based on data from nearly 100 million stops nationwide); Stephen

Rushin & Griffin Edwards, *An Empirical Assessment of Pretextual Stops and Racial Profiling*, 73 Stan. L. Rev. 637 (2021) (based on data from over 8 million stops in Washington state); Frank R. Baumgartner, Derek A. Epp & Kelsey Shoub, *Suspect Citizens* 215 (2018) (based on 18 years of data in North Carolina); Samuel R. Gross & Katherine Y. Barnes, *Road Work: Racial Profiling and Drug Interdiction on the Highway*, 101 Mich. L. Rev. 651, 666–67 (2002) (based on three years of data from Maryland State Police). The Department of Justice's own data has long supported the conclusion that Black and Hispanic drivers are significantly more likely than white drivers to be searched during a traffic stop. Patrick A. Langan et al., Bureau of Justice Statistics, Contacts Between Police and the Public, at 18 (2001).

For example, the North Carolina study found that, on average, Black drivers were twice as likely to be searched as white drivers, with some police forces having much higher rates of racial disparity. The empirical work also shows that when police use traffic stops to search for drugs, a small fraction of searches turn up any drugs, and the proportion finding dealer quantities of drugs is much lower still. The North Carolina study looked at data from more than 20 million traffic stops. Searches were carried out in a small fraction, about 690,000, or 3.36%. Baumgartner et al., *Suspect Citizens* 59. Drugs were found—in any quantity—in 96,841 of those stops, or 14% of all searches. *Id*. at 62. Typically, dealer quantities are found in a small fraction of those. See Gross & Barnes, 101 Mich. L. Rev. at 695–97 (88.8% of Maryland State Police vehicle searches in drug corridor did not locate dealer quantities of drugs). In other words, these intrusive and humiliating police tactics are used disproportionately on Black and Hispanic drivers, the vast majority of whom are not trafficking drugs,

and thus whose cases do not wind up in criminal courts to shape Fourth Amendment jurisprudence.[1]

II. *Limits on Pretextual Stops*

While pretextual traffic stops are easy to initiate, the Supreme Court has tried to impose some legal limits on them. Most important, such a stop is limited by time and the purpose that makes the stop lawful in the first place. A seizure that is "lawful at its inception" can violate the Fourth Amendment if it is "prolonged beyond the time reasonably required to complete" the initial mission of the stop. *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).

The Supreme Court took an important step to make this limit effective in *Rodriguez v. United States*, 575 U.S. 348 (2015), which established the governing law for this appeal. In *Rodriguez*, a police officer had carried out a traffic stop for a car that had driven onto the shoulder of the highway. After the officer had issued and explained a written warning to the driver, he insisted that the driver could not leave until another officer arrived some minutes later with a drug-sniffing dog, which led to a search that found drugs in the car.

The district court in *Rodriguez* denied a motion to suppress, applying circuit precedent holding that dog sniffs that occur shortly after completion of the traffic stop did not violate the Fourth Amendment if the intrusion on the driver's liberty was "de minimis." 575 U.S. at 353. *Rodriguez* rejected that

---

[1] For interested readers, the articles cited in the text cite in turn numerous other sources on the doctrinal questions and empirical effects of *Whren*'s pretextual stops.

"de minimis" exception. The Court vacated the denial of the motion to suppress and remanded.

Establishing guidance that applies here, *Rodriguez* explained that "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." 575 U.S. at 350. During a traffic stop, the police officer must stick to the "mission" of the seizure: ensuring road safety and determining whether to issue a traffic ticket. "Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 355. An officer may not prolong the stop, "absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* The latter qualification creates an opportunity for exploiting pretextual stops. The question for the officer is whether he can see, hear, or smell anything that provides reasonable suspicion for expanding the scope of the pretextual traffic stop.

III. *Prolonging the Stop in This Case*

One way to prolong a pretextual stop is to question drivers and passengers about topics beyond the mission authorized by the supposed ground for the stop. That's what happened here, for all to see in Trooper Chapman's video recording of the stop.

The trooper's tailgating rationale for stopping Janhoi Cole was obviously pretextual. The trooper had received the tip from Deputy Suttles, who suspected the car was transporting

drugs.[2] The trooper began following Cole's car, looking for a reason to stop him. Cole was driving so carefully that it took a while. (The most startling fact in this case is that Cole was driving so carefully that Deputy Suttles never managed to identify even a pretext for stopping him.) Trooper Chapman also found no basis for a stop until, finally, Cole entered a construction zone where interstate highway lanes had to merge. The trooper saw another vehicle cut off Cole's car. The trooper did not stop the other vehicle for its dangerous maneuver. Instead, he stopped Cole on the ground that he had followed that other car too closely for a few seconds.

Following too closely was enough, based on the district court's factual findings, to permit the stop under *Whren*. But the supposed infraction of following too closely also set limits on the trooper's powers over Cole and his vehicle, unless and

---

[2] The tip from Deputy Suttles fell well short of reasonable suspicion. He observed that Cole was driving below the speed limit on an interstate highway in a car with California plates. He sat with an erect posture that Suttles thought was unusual, and he had empty fast-food wrappers in the car. Suttles also apparently thought that two contradictory observations added to the suspicion: that the only luggage he could see was a small backpack and that the cargo area of the car was covered. See generally *Kansas v. Glover*, 589 U.S. —, —, 140 S. Ct. 1183, 1190 (2020) (traffic stops do not "allow officers to stop drivers whose conduct is no different from any other driver's"); *United States v. Flores*, 798 F.3d 645, 649 (7th Cir. 2015) ("A suspicion so broad that would permit the police to stop a substantial portion of the lawfully driving public ... is not reasonable."); *United States v. Ingrao*, 897 F.2d 860, 865 (7th Cir. 1990) (reversing denial of motion to suppress where arrest was based in part on defendant's cautious driving: "The mere lawful operation of a motor vehicle should not be considered suspicious activity absent extraordinary contemporaneous events.").

until the trooper developed reasonable suspicion for further investigation.

Under *Rodriguez* and *Caballes*, the trooper's authority to pull Cole over did not give him license to detain Cole for a speculative search or interrogation for "evidence of ordinary criminal wrongdoing." *Rodriguez*, 575 U.S. at 355, quoting *City of Indianapolis v. Edmond*, 531 U.S. 32, 41 (2000). Police detention, however brief, is not a "minor inconvenience and petty indignity." *Terry v. Ohio*, 392 U.S. 1, 10, 16–17 (1968) (citation omitted). The Supreme Court has "emphatically reject[ed]" the notion that the Constitution does not regulate an officer's actions when he "accosts an individual and restrains his freedom to walk away." *Id.* at 16.

In pretextual traffic stops, courts should expect just the sort of "mission creep" that we see in this case. See *State v. Jimenez*, 420 P.3d 464, 476, 308 Kan. 315, 329–30 (2018) (following *Rodriguez* to affirm suppression of evidence from stop prolonged by questions about travel plans unrelated to grounds for stop). After all, if a stop is actually motivated by a different purpose, we should expect officers to behave consistently with their actual purposes, not with the legal fiction that *Whren* tolerates.

That's what happened here, as the record makes obvious. Even before stopping Cole, the trooper had already obtained most of the information that *Rodriguez* treats as routinely within the scope of a traffic stop: "determining whether to issue a traffic ticket, … checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." 575 U.S. at 355. The trooper already had obtained the registration information for the car showing Cole

as the owner. He also had Cole's license information. (As for the last *Rodriguez* item, insurance, the trooper already knew that insurance information was on file, though he did not yet have details. He did nothing more about insurance information until nearly twenty minutes into the stop, well after he had improperly prolonged the stop by interrogating Cole on other topics.)

Instead of focusing on the tailgating and the routine topics of license, registration, and insurance, the trooper almost immediately focused on a different topic: detailed, repetitive, and intrusive questioning about Cole's travel itinerary. The questioning went far beyond a quick and routine "where are you headed?" or "where are you coming from?" In the ten minutes of the stop while the trooper kept Cole in the police car at the side of the highway, about six minutes consisted of questioning about Cole's itinerary and the related topic of his work.[3]

We now know that Cole's confusing answers on those topics were not true. And as a person who was transporting a substantial quantity of illegal drugs, Cole elicits little sympathy. Yet the stakes here are more important than this one drug

---

[3] The majority suggests that its essay on travel plan questions results from the record being "undeveloped" on whether the trooper's questioning actually prolonged the stop. Ante at 11. The record is more than sufficient to say that it did. We have the video recording of the stop. We also know that the trooper already had license and registration information at the outset, and that he did not seek more insurance information until much later in the stop. The government has not tried to show that the trooper was actually making any progress on the subject of the traffic stop while he interrogated Cole about his travel plans. Cf. *United States v. Lewis*, 920 F.3d 483, 492 (7th Cir. 2019) (video and testimony showed that officer worked on warning while questioning driver about itinerary).

courier. The evidence is clear that police use these tactics to stop, search, and even humiliate large numbers of innocent drivers, and that these tactics are used disproportionately on Blacks and Hispanics.

*Rodriguez* makes clear that a traffic stop's mission is "to address the traffic violation that warranted the stop and attend to related safety concerns." 575 U.S. at 354 (internal citation omitted); *United States v. Clark*, 902 F.3d 404, 411 (3d Cir. 2018) (affirming suppression of evidence obtained by prolonging traffic stop by questioning driver about his criminal history). Hence the *Rodriguez* endorsement of the usual litany: license, registration, and insurance, and an opportunity to check for outstanding warrants. 575 U.S. at 355.

Courts need to guard against unjustified expansion and prolonging of pretextual stops by questioning on other topics. As the Third Circuit explained in *Clark*: "Not all inquiries during a traffic stop qualify as ordinarily incident to the stop's mission. In particular, those 'measure[s] aimed at detect[ing] evidence of ordinary criminal wrongdoing' do not pass muster." 902 F.3d at 410 (alterations in original), quoting *Rodriguez*, 575 U.S. at 355. Since detecting evidence of ordinary criminal wrongdoing is often the officer's real purpose, we should not be surprised when an officer devotes his time to pursuing his real aims rather than the pretext.[4]

---

[4] *Whren* established that whether a stop is constitutionally permissible depends on objective grounds, not the officer's subjective purpose, whether pretextual or not. Contrary to the majority's footnote, however, that rule about the legality of the initial stop does not mean that courts must or may close their eyes to what was really going on. Cf. ante at 8 n.1. When considering factual issues that govern whether the officer has gone

Where should we draw the lines on how an officer may spend his time in such a stop? We start with the *Rodriguez* list of the activities typically part of the mission of the traffic stop: checking license, registration, and insurance information, and the opportunity to check for outstanding warrants. 575 U.S. at 355. Those actions are designed to protect highway safety by determining whether the vehicle and driver are authorized to be on the road at all, and whether they might pose a particular danger to others on the road. *Rodriguez* also recognized that traffic stops can be dangerous for police officers, *id*. at 356, so that measures to protect an officer's safety can also be authorized. Beyond the listed topics, however, which activities are permissible quickly becomes a very case-specific problem. It defies general rules like the majority's presumption here.

Courts applying *Rodriguez* must consider whether an officer spent time on matters apart from those safety-based matters authorized by the lawful but pretextual basis for the stop, at least unless and until the officer developed reasonable suspicion to pursue other matters. See, e.g., *United States v. Cortez*, 965 F.3d 827, 839–40 (10th Cir. 2020) (assuming without deciding that thirteen minutes of repetitive questioning about how long driver and passenger had been in town where journey started was not justified by traffic stop, but officer already

beyond the boundaries permitted by the traffic stop, courts should pay attention to reality rather than legal fiction. *Rodriguez* itself makes that much clear. It directs lower federal courts to consider actual facts in evaluating whether a stop has been extended impermissibly. 575 U.S. at 357 ("The reasonableness of a seizure, however, depends on what the police in fact do. See *Knowles* [*v. Iowa*, 525 U.S. 113, 115–17 (1998).] In this regard, the Government acknowledges that 'an officer always has to be reasonably diligent.' Tr. of Oral Arg. 49. How could diligence be gauged other than by noting what the officer actually did and how he did it?").

had independent reasonable suspicion of human smuggling before beginning those questions); *Clark*, 902 F.3d at 410–11 (stop improperly prolonged to question driver about his criminal history); *United States v. Evans*, 786 F.3d 779, 787 (9th Cir. 2015) (stop improperly prolonged to see if driver had properly registered in Nevada registry of ex-felons).

Turning to questions about travel plans, courts must "inquire whether, on the facts of the particular case, [itinerary] questioning is within the traffic stop's mission" and if not, must determine whether the questioning impermissibly lengthened the stop. 4 Wayne R. LaFave, Search & Seizure § 9.3(d) (6th ed. 2020). There has never been a problem with a brief question or two about travel like, "Where are you headed today?" or "Where are you coming from?" As the arresting officer in *Cortez* testified, innocuous background questions can help an officer assess a driver's stress and possible evasion, and they may help an officer gauge how cautious he needs to be in the stop. 965 F.3d at 839.

Similarly, if an officer has reason to suspect that a driver may be impaired by fatigue, alcohol, or drugs, questioning about how long the driver has been on the road and where he is headed might help the officer assess the driver's condition and any dangers that might be posed. *Jimenez*, 420 P.3d at 475–76, 308 Kan. at 329; see also *Navarette v. California*, 572 U.S. 393, 402–03 (2014) (report that truck had forced another vehicle off road gave officer reasonable suspicion that driver was impaired, permitting stop to investigate). In other cases, information about travel plans might help an officer decide whether to issue a ticket or a warning, or perhaps even to hop back in the police car and lead a speeding car to a hospital so

the passenger can safely give birth. See *United States v. Brigham*, 382 F.3d 500, 508 & n.6 (5th Cir. 2004) (en banc).

This case, however, is not about such brief, routine, and easily justifiable questions. This case is about whether an officer may start with those questions and then prolong the stop while continuing to probe the answers, looking for evasion and contradiction by asking more questions, by repeating the questions, by asking others the same questions, and by checking answers against other information that might be available with in-car computers. As Professor LaFave has explained in his treatise, the controversy is over

> multi-question extended inquiries of vehicle occupants into the most minute details regarding the parts of the journey completed and lying ahead. The officers are "trained to subtly ask questions about * * * their destination, their itinerary, the purpose of their visit, the names and addresses of whomever they are going to see, etc.," "to make this conversation appear as natural and routine a part of the collection of information incident to a citation or warning," and "to interrogate the passengers separately, so their stories can be compared." The objective is not to gain some insight into the traffic infraction providing the legal basis for the stop, but to uncover inconsistent, evasive or false assertions that can contribute to reasonable suspicion or probable cause regarding drugs.

4 LaFave, Search & Seizure § 9.3(d) (footnotes omitted), quoting Gross & Barnes, 101 Mich. L. Rev. at 685.[5]

Cases after *Rodriguez* from around the country illustrate the wide, almost kaleidoscopic variations in the ways these questions can arise and play out. Several circuits have taken the route the majority does here, which I believe is contrary to *Rodriguez*, writing that questions about a driver's travel plans are ordinarily within the scope of a traffic stop, and that an officer may prolong a stop to ask follow-up questions to confirm or check those answers. *United States v. Braddy*, 11 F.4th 1298, 1311 (11th Cir. 2021) (following pre-*Rodriguez* case law on itinerary questions, at least where driver's license had incorrect address and ownership of vehicle was not clear); *United States v. Dion*, 859 F.3d 114, 125–26 & n.7 (1st Cir. 2017) (defendant conceded that pre-*Rodriguez* case law allowed itinerary questions); *United States v. Collazo*, 818 F.3d 247, 258 (6th Cir. 2016) (allowing questions to follow up on conflicting answers from driver and passenger). But see *United States v. Callison*, 2 F.4th 1128, 1131–32 & n.2 (8th Cir. 2021) (holding that itinerary questions were permissible because the officer, as a matter of fact, was still "handl[ing] the matter for which the stop was made," but declining to reach the question of "the extent to which officers may ask travel-related questions

---

[5] The majority asserts that this stop was not a "fishing expedition," see ante at 18, and implies that it was Cole's answers to the travel plan questions that led the trooper to suspect that he was transporting drugs. Ante at 2. The record contradicts both the assertion and the implication. The trooper was always acting on Deputy Suttles' hunch that Cole was transporting drugs. He was looking for a way to justify a longer stop that would lead to a search. And as the trooper later testified, he simply was not going to let Cole go, no matter what, until a dog could sniff the car for drugs.

during a routine traffic stop after *Rodriguez*.") (alteration in original), quoting *Rodriguez*, 575 U.S. at 350.

The majority's summary of other courts' decisions, however, glosses over substantial variety among the approaches. Other courts have wisely taken more nuanced and fact-specific approaches to the problem, recognizing that not all traffic stops justify prolonged and close interrogation about travel plans. See, e.g., *United States v. Gomez-Arzate*, 981 F.3d 832, 836, 840–44 (10th Cir. 2020) (finding that a few minutes of itinerary questioning that prolonged an already completed stop violated Constitution, but noting extended inquiry into car ownership may be permissible where driver is not listed on registration and cannot say who owns vehicle); *United States v. Garner*, 961 F.3d 264, 271–72 (3d Cir. 2020) (some itinerary questions were permissible; some follow-up on employment, family, criminal history, and unrelated conduct was not, but officer's reasonable suspicion of criminal activity permitted the additional questioning); *Jimenez*, 420 P.3d at 469, 475–77, 308 Kan. at 318, 328–30 (affirming suppression where itinerary questions prolonged stop for following too closely, and noting that courts must guard against "mission creep" in pretextual traffic stops); see also *Cortez*, 965 F.3d at 839–40 (some itinerary questions were permissible, but later follow-up questioning fell outside bounds permitted by original reason for stop).

Disagreeing with the majority's rule in this case, Professor LaFave's treatise has this to say about travel-plan questioning as it is actually carried out by officers who are looking for drugs:

> The objective is not to gain some insight into the traffic infraction providing the legal basis for

> the stop, but to uncover inconsistent, evasive or
> false assertions that can contribute to reasonable
> suspicion or probable cause regarding drugs.
> Thus, "[n]ot only are questions about travel
> plans investigatory rather than merely conver-
> sational, the ordinary traveler cannot reasona-
> bly be expected to decline to answer such ques-
> tions, particularly if they are posed while an of-
> ficer is holding the driver's license and other es-
> sential documents."

4 LaFave, Search & Seizure § 9.3(d) (alteration in original)
(footnote and citation omitted).

In this case, the trooper's questions did nothing to advance
the limited road- and driver-safety missions that he was le-
gally authorized to pursue. Cole's claim to be a California-
based traveling personal chef employed part-time in Mary-
land had nothing to do with whether he was safe to continue
driving. And Trooper Chapman knew that Cole was author-
ized to drive the Volkswagen when he saw that his name
matched the registration mere seconds into the initial ten-mi-
nute stop at the roadside.

It should not matter here whether, at some later point,
Cole's answers became suspicious. The critical point under
*Rodriguez* is that it was unconstitutional to prolong the stop,
the restraint on liberty, to ask those questions to begin with.
*United States v. Lopez*, 907 F.3d 472, 486–87 (7th Cir. 2018) (sup-
pressing evidence gathered following questioning that pro-
longed seizure); see also *Garner*, 961 F.3d at 270–71 (looking
for "*Rodriguez* moment" when officer began pursuing off-mis-
sion tasks); *United States v. Childs*, 277 F.3d 947, 952 (7th Cir.
2002) (en banc) ("Questioning that prolongs the detention, yet

cannot be justified by the purpose of such an investigatory stop, is unreasonable under the fourth amendment."), citing *United States v. Sharpe*, 470 U.S. 675, 685 (1985).

When asked to explain his actions, Trooper Chapman admitted that he delayed collecting the last of the authorized information (for investigating the tailgating and Cole's driving) because he "was trying to piece together Mr. Cole's story, which was—as we all heard, was kind of inconsistent. Changed each time." Tr. 35.

With respect, that is not how this is supposed to work. Under the Constitution, people do not need "stories" to travel on interstate highways—even if they have a broken taillight, don't signal a lane change, or briefly tailgate another vehicle. Unless an officer efficiently processing the legitimate purpose of the stop sees, hears, or smells something new that gives him reasonable suspicion of other criminal activity, he needs to let the driver go with a ticket or warning when the legitimate tasks are done. This rule applies even if the officer still has a hunch the driver is up to no good.

We have explained that during a *Terry* stop, one of three things must happen:

> (1) the police gather enough information to develop probable cause and allow for continued detention; (2) the suspicions of the police are dispelled and they release the suspect; or (3) the suspicions of the police are *not* dispelled, yet the officers have not developed probable cause but must release the suspect because the length of the stop is about to become unreasonable.

*United States v. Leo*, 792 F.3d 742, 751 (7th Cir. 2015) (internal citations omitted). An officer who reasonably believes a driver is suspicious based on some ambiguous or conflicting statements may not detain the suspect indefinitely, lest the stop turn into "a de facto arrest that must be based on probable cause." See *id.*, quoting *United States v. Bullock*, 632 F.3d 1004, 1015 (7th Cir. 2011).

IV. *Other Problems with the Majority Holding*

The majority here adopts a different rule, at least "ordinarily." Ante at 12 ("[W]e hold that travel-plan questions ordinarily fall within the mission of a traffic stop."). The majority does not hint at what might not be ordinary. It offers instead what is supposed to be a reassuring limit: "This does not mean, however, that officers have a free pass to ask travel-plan questions until they are subjectively satisfied with the answers. [Such questions] must remain reasonable, and reasonableness is an objective standard based on all the circumstances." Ante at 13. If the officer's questions "go too far and become unreasonable," the stop may no longer be permissible. Ante at 16.

Despite that assurance, the majority's approach invites unreasonable restraints on liberty. The majority adds that an officer asking travel-plan questions may ask "reasonable follow-up questions," especially if the answers are "evasive, inconsistent, or improbable." Ante at 16. That's the critical door that enables further abuse of pretextual traffic stops, prolonging those stops as the officer uses the coercive power of the state and the authority to use force to subject drivers and their passengers to close questioning in search of other criminal activity. That is exactly what *Rodriguez* rejected. 575 U.S. at 355–56. All the other questions that *Rodriguez* treats as part of the

mission of every stop should quickly produce a clear answer rather than inviting discretionary interrogation. A driver's license can be valid or not, but it is unlikely to call for follow-up questions.

In *Rodriguez*, the Supreme Court pointedly declined to categorically permit questioning about travel plans as central—even "ordinarily" central—to traffic stops' missions. The officer in *Rodriguez* had asked the driver and passenger about their itinerary, 575 U.S. at 351, but the Court left travel plans out of the topics typically permissible because they help ensure that vehicles are "operated safely and responsibly," *id.* at 355. The majority responds to this omission by noting that judicial opinions are not statutes and that the travel-plan questions were not directly at issue in *Rodriguez*, so we should infer nothing from the omission of travel-plan questions from the *Rodriguez* list. Ante at 11.

That is an unduly narrow understanding of the opinion. The Court knew it was providing important and practical guidance for police officers and motorists all over the nation, especially with that key passage about what is "typically" within the scope of a traffic stop. No one suggests that the list is universal and complete for all cases. As noted above, for some traffic stops travel plans will be relevant. But those cases should be evaluated based on their specific facts, not using a general rule that allows such persistent, repetitive, and close questioning in a stop legally justified as merely a routine traffic stop. At a minimum, courts should expect an officer who engages in such questioning to be able to explain how, specifically, the questioning was based on the legal justification for the stop. As Professor LaFave has explained:

> [G]iven the Supreme Court's *Rodriguez* decision, … *the contention "that unrestrained travel plan questioning is routine and always within a traffic stop's mission" must be rejected out of hand*, and … instead courts must inquire whether, on the facts of the particular case, such questioning is within the traffic stop's mission.

4 LaFave, Search & Seizure § 9.3(d) (emphasis added) (footnote and citation omitted).

The extraordinary nature of this en banc rehearing also should not be passed by in silence. After the panel issued its decision, the government chose not to seek en banc review. It also informed this court that it did not oppose Cole's motion for immediate release from prison. No litigant is better able to protect its interests in the federal courts than the federal government. This court chose, however, to act sua sponte to rehear the case en banc. That is an extraordinary step that this court has taken very rarely.

The majority suggests that en banc review was needed to resolve an apparent conflict between the panel decision here and another post-*Rodriguez* decision, *United States v. Lewis*, 920 F.3d 483 (7th Cir. 2019). The supposed conflict was illusory. *Lewis* did not hold that an officer may prolong a stop indefinitely to ask increasingly invasive and repetitive questions about a driver's travels and employer—nor could it have, given *Rodriguez*. As *Lewis* explained, the most important reason it had for affirming denial of the motion to suppress there was that the defendant had simply failed as a matter of fact to show that the questioning had actually prolonged the stop. *Id.* at 492. Careful analysis of *Lewis* shows that the case is distinguishable on that fact, which is decisive under

*Rodriguez*. See *United States v. Cole*, 994 F.3d 844, 855–57 (7th Cir. 2021) (panel decision here).

V.  *Moving Forward*

Having explained why I view the majority's general presumption in favor of allowing questions about travel plans in pretextual traffic stops as unwise and contrary to *Rodriguez*, it is still necessary to look toward future cases.

District courts should be alert for unconstitutional "mission creep" where the stop is justified constitutionally by one limited purpose but is actually motivated by a different purpose. See *Jimenez*, 420 P.3d at 476, 308 Kan. at 329–30. In such cases, district courts must make the joint legal and factual determination of how long was reasonably necessary to execute the stop's permissible mission, and must then decide whether the stop's duration exceeded that limit or the officer otherwise unreasonably prolonged the stop. Extensive itinerary questions posed to a motorist stopped for a broken taillight or tailgating, for example, should not pass muster.

Courts deciding motions to suppress often give officers substantial leeway in evaluating their actions and credibility. An obviously pretextual stop, however, calls for more skepticism. We should expect officers to behave in ways that serve their real purpose, without necessarily working from the pretextual basis for the stop. When officers do so, district courts should make the appropriate factual findings, and our review of their fact-finding should be deferential. E.g., *United States v. Simon*, 937 F.3d 820, 832–33 (7th Cir. 2019) (deferring to district court's credibility determinations as to whether the officers prolonged a stop); *Lewis*, 920 F.3d at 492 (similar); see also *United States v. Rodriguez-Escalera*, 884 F.3d 661, 672 (7th Cir.

2018) (affirming grant of motion to suppress based on factual findings, including those on credibility).

We should reverse this judgment, suppress the evidence obtained by improperly prolonging this traffic stop, and remand to allow Cole to withdraw his guilty plea.