In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 20-2168

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JACQUES S. GHOLSTON,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Central District of Illinois.
No. 18-CR-30039 — **Richard Mills**, *Judge.*

———————————

ARGUED NOVEMBER 30, 2020 — DECIDED JUNE 14, 2021

———————————

Before EASTERBROOK, WOOD, and HAMILTON, *Circuit Judges.*

WOOD, *Circuit Judge.* Officer Erik Cowick pulled over Jacques Gholston just after midnight on April 29, 2018, for turning without signaling. Because Cowick suspected that Gholston was a drug dealer, he called for a trained dog to perform a drug sniff at the scene. As Cowick was finishing the routine procedures required for a minor traffic violation, the

dog arrived and alerted officers to the presence of methamphetamine.

The discovery of the drugs led in time to federal charges for possession of five or more grams of methamphetamine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B). In response, Gholston filed a pretrial motion to suppress the evidence of the meth seized as a result of the dog sniff. He contended that Cowick unreasonably delayed the stop in order to allow the "K9" officer to arrive and perform an inspection. The district court denied the motion. Gholston then pleaded guilty, reserving his right to challenge the ruling on the motion to suppress. We conclude that the district court committed no reversible error in finding that Cowick did not unlawfully prolong the stop and thus did not violate Gholston's Fourth Amendment rights. We therefore affirm.

**I**

Officer Cowick had long suspected that Gholston was distributing large quantities of methamphetamine from his truck. Cowick had an informant, Taylour Toolate, who occasionally provided information about criminal activity in Quincy, Illinois. On one occasion at an unspecified time, Toolate informed Cowick that she believed that Gholston was about to pick up and deliver large quantities of methamphetamine using his green pickup truck, which had a toolbox in the bed. She predicted that Gholston would store the methamphetamine in a magnetic box affixed to the bottom of the truck. Cowick also vaguely said that other people he had arrested in the past told him that Gholston sold methamphetamine from his truck. Cowick could not identify any of them by name, nor could he provide any details or documentation about those supposed encounters.

In the early morning hours of April 29, 2018, Cowick was patrolling a high crime area in Quincy. He spotted Gholston's green pickup truck with the toolbox in its bed. Evidently Cowick had kept Toolate's tip in mind for some time, as she had been incarcerated since January 10, 2018. He decided to follow Gholston to see if he could stop him for a traffic infraction.

An opportunity presented itself when, around 12:16 am, Gholston turned right from 5th Street onto Chestnut Street without using a turn signal. Cowick caught up to Gholston's truck, activating his emergency lights at 12:17 am as he made the same turn onto Chestnut Street. By the time Cowick finished turning, Gholston had already parked the truck and was walking away. This further heightened Cowick's suspicions, as he believes that "walk[ing] away from a traffic stop in this area" usually means drugs are involved. Cowick radioed to dispatch that he was preparing to make a stop. He then called out for Gholston to stop, but Gholston kept walking. This, too, disturbed Cowick, because he thought that the two had made eye contact. Cowick decided to follow Gholston on foot, calling after Gholston until he responded and returned to the car. Gholston explained that he did not hear Cowick calling him at first. He added that Cowick did not turn on his lights until after Gholston was already out of the car, and so he did not realize that Cowick was after him. Cowick handcuffed Gholston at 12:18 am and sat him on the curb. Around that time, Officers Hodges and Cirrincione arrived at the scene.

Cowick began the standard procedure for writing a ticket, but there were a few delays along the way. When asked for his license, Gholston explained that his ID was in his truck.

Cowick, unprovoked, asked if there was a reason Gholston did not want Cowick to retrieve the ID from the vehicle, to which Gholston responded "huh." That was the most that Gholston said; he never stated in so many words that he did not want Cowick to retrieve the ID from the car. Instead, Gholston verbally conveyed his ID information to Cowick. Cowick also conducted an additional consensual search of Gholston's person; it did not turn up anything. He then returned to his squad car and radioed dispatch to confirm whether Gholston had a valid driver's license. Dispatch informed Cowick that Gholston's ID was valid but that he also had a Notice of Violation ("Notice") on file for improperly parking over a year earlier.

At that point Cowick contacted two more officers to assist him with the stop. First, at 12:24:23 am, he looked up the location of a K9 officer, Deputy Saalborn (known as "sam12"), who was six to seven miles away from the stop. Next, he called for assistance in retrieving the Notice from the police station and delivering it to the traffic stop. Sargent Elbus radioed back that he could pick up the Notice. Cowick immediately responded at 12:26:43 am, using the car's messaging terminal, inviting Elbus to "take your time!!" because he was "trying to get sam12 here." Cowick was also communicating with Officer Cirrincione about getting Saalborn to the scene. At 12:28:03 am, Cirrincione messaged Cowick through his car terminal saying that Saalborn was on the way.

Throughout the time he was completing the ticket, Cowick continued to urge Elbus to take his time, sending him messages at 12:29:15 am and 12:29:20 am to that effect. He did the opposite with Saalborn, urging him at 12:30:31 am to "drive fast" because he could guarantee that Gholston had drugs in

his car. Cowick printed Gholston's warning ticket for failing to use his turn signal at 12:32:27 am, 14 minutes after he had handcuffed Gholston.

As Cowick returned to Gholston to hand him the printed ticket, he realized that he had not yet asked Gholston for his insurance information. Gholston explained that his girlfriend had the truck insured but that he did not have proof of insurance on him. Cowick went back to his car to write a ticket for that infraction. As Cowick was finishing the second ticket, Saalborn arrived and walked the drug-sniffing dog around Gholston's truck. The dog alerted as the ticket was still printing. The officers searched the truck and discovered 9 grams of methamphetamine.

The government brought charges against Gholston, and as we noted, he moved to suppress the drugs on the ground that Cowick unreasonably extended the stop in violation of the Fourth Amendment. The district court referred the motion to suppress to a magistrate judge, who held that Cowick did extend the stop beyond the time reasonably required so that Saalborn could arrive and search for the methamphetamine. Nevertheless, the magistrate judge found that the stop did not raise constitutional concerns because Cowick had reasonable suspicion to continue holding Gholston based on Toolate's tip. For the most part, the district court adopted the magistrate judge's findings of fact, but it disagreed with her in one key respect, finding that Cowick did *not* unreasonably extend the stop. Cowick's delays, it thought, were minor, and his failure to request Gholston's insurance information at the start of the stop was a good-faith blunder.

**II**

In cases involving an appeal of a denial of a motion to suppress, a mixed standard of review applies: We review the district court's factual findings for clear error, and we evaluate legal conclusions and mixed questions of law and fact *de novo*. *United States v. Williams*, 731 F.3d 678, 683 (7th Cir. 2013).

Whether a lawful stop extends so long that it raises constitutional concerns turns on reasonableness. As relevant for our purposes, a seizure made in order to issue a warning ticket to a driver "can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005); *Rodriguez v. United States*, 575 U.S. 348, 357 (2015). The goal is to complete such a stop in a reasonable time. Side-inquiries into other potential crimes such as drug-related activity represent a "detour[] from [the original] mission." *Rodriguez*, 575 U.S. at 356.

While officers must act diligently, we repeatedly have declined to adopt even a rule of thumb that relies on the number of minutes any given stop lasts. We explained recently in *United States v. Lopez*, 907 F.3d 472 (7th Cir. 2018), that we ask whether the defendant was detained longer than necessary for the underlying investigation, not "exactly how many minutes the stop lasts." *Id*. at 486. A stop may call for a variety of measures beyond printing the ticket, including "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez*, 575 U.S. at 355.

Guided by these principles, the district court found that Officer Cowick did not unreasonably extend Gholston's stop.

It noted that most of the alleged delays were attributable to reasonable mistakes or forces outside of Cowick's control. For example, it found as a fact that Gholston's failure to provide Cowick with his ID increased the amount of time needed for the stop. Cowick had to enter Gholston's information manually rather than filling all fields with a quick scan of a barcode. The district court further determined that Cowick made an "innocent mistake" when he failed to acquire Gholston's proof of insurance at the beginning of the stop; the oversight, the court found, was attributable to the unusual nature of the stop. Reasonable delays such as these, the court concluded, largely accounted for why this routine stop lasted longer than some.

The district court next reasoned that none of Cowick's actions unrelated to the stop meaningfully lengthened it. The district court catalogued a few of the examples that had concerned the magistrate judge: Cowick spoke with Hodges and Cirrincione about his suspicion that Gholston had drugs in his truck; he took time away from completing the tickets to call several people; he sent messages to Elbus asking him to obtain the Notice; he repeatedly urged Saalborn to arrive with the dog as soon as possible. Despite all this, the district court concluded that Cowick did not unreasonably prolong the stop. The district court credited Cowick's testimony that he never stopped working on the warning between 12:24 am and 12:32 am (when he printed the warning ticket), even as he communicated with the other officers. As we noted, the district court concluded that Cowick's delay issuing the proof-of-insurance ticket was an innocent mistake and that the dog alerted as the ticket printed.

Gholston takes issue with the district court's determination that Cowick did not unreasonably delay the stop. In Gholston's opinion, Cowick took a number of actions unconnected to writing the tickets, and those steps collectively gave rise to an unconstitutional extension of the stop.

The first period of delay to which Gholston points could not unreasonably have prolonged the stop. Gholston argues that Cowick had the information he needed to begin writing Gholston's ticket at 12:22 am, but he did not begin doing so until 12:24 am. Why? Because he first conducted a consent search of Gholston's person and continually prodded Gholston to agree to a search of the car. That has nothing to do with Saalborn; Cowick did not contact Saalborn until after returning to his car to begin issuing the ticket. The district court thus correctly disregarded these events.

Gholston also disagrees with the district court's characterization of Cowick's actions while Cowick sat in his car working on the ticket and urging Saalborn to hurry to the scene. Gholston emphasizes that Cowick sent messages to Elbus and Saalborn multiple times while in his car and called Elbus once to ensure that Elbus was receiving his messages. No reasonable person, he contends, could think that Cowick was diligently working on the ticket during that time, because Cowick admitted that he had to use the same keyboard to message the other officers and to complete the ticket.

Given the deferential standard of review that applies to the underlying facts, however, we see no reversible error. The district court's conclusion, based on Cowick's testimony, that Cowick did not unreasonably delay the stop in order to communicate with other officers on unrelated topics is a finding of fact that we review for clear error. Even if Cowick had to

use the same keyboard, there are many reasons why he might have been able to communicate with his fellow officers without slowing down the ticket process, including his need to wait for dispatch to verify that Gholston's ID was valid. We cannot say that the district court's factual determination was clearly erroneous.

Nor did the district court commit clear error when it determined that Cowick's failure to ask for Gholston's proof of insurance at the start of the stop was an innocent mistake, not a manipulative ruse. Recall that Cowick had to get out of his car to catch up with Gholston, who already had left his truck. He may simply have been focusing on catching Gholston, rather than on the details of ticket-writing. Characterizing that omission one way or the other is a straightforward credibility issue for the court. We have no reason to disturb it. The court's finding was corroborated by the fact that Cowick told his fellow officers that he found it frustrating that he had to enter Gholston's ID information a second time for the second ticket. Similarly, it makes no difference whether Gholston refused to allow Cowick to retrieve his ID from the truck, because Gholston began communicating his ID information verbally. In sum, we cannot say that the district court committed clear error in finding that the need to enter Gholston's ID information manually added any appreciable time to the stop.

Gholston contends that the district court's reasoning is inconsistent with the holding of *Rodriguez v. United States*, 575 U.S. 348 (2015), which rejects a *de minimis* rule for extensions of a stop. Gholston correctly notes that this is the way the district court characterized Cowick's delays.

Although the district court may have chosen imperfect language to describe its factual findings, in substance it stayed

within the bounds identified in *Rodriguez*. The Court there identified a number of routine activities that accompany traffic stops, including license and warrant checks and verification of registration and insurance. *Rodriguez*, 575 U.S. at 355. The district court here found that Cowick detained Gholston only long enough to complete these same procedures, and that the dog alerted before Cowick had finished printing the second ticket. This is not a case in which an officer completes the activities for a stop and then detains the suspect longer in order to allow time for a K9 officer to arrive. The district court credited Cowick's testimony that he never stopped working on the ticket even as he communicated with other officers. Critically, the court found that Cowick did not extend the stop at all, not that any delay was permissibly *de minimis*. Based on those factual findings, the court correctly held that this stop did not run afoul of the Fourth Amendment.

## III

Having determined that the stop was not unreasonably extended, we need not reach Gholston's other arguments. The district court's factual findings were not clearly erroneous. On that understanding of the events in question, the stop was not unconstitutionally extended beyond the time reasonably required, and so we AFFIRM the judgment of the district court.

HAMILTON, *Circuit Judge*, dissenting. "This is not how we typically do a traffic stop." Officer Cowick's testimony admitted the obvious: he and his colleagues slow-walked the pretextual traffic stop of Mr. Gholston (for turning without signaling in otherwise deserted streets) while waiting on a drug-sniffing dog. The majority opinion acknowledges the ample evidence of this delay: texting one officer to hurry up with the dog while texting another to take his time to bring some needed paperwork, taking time to handcuff and frisk Gholston, taking time to convince Gholston to agree to a more thorough search of his person, doing the search, and trying to convince him to consent to a search of his vehicle. Even with all these delays, the legitimate turn-signal ticket was complete about five minutes before the dog arrived. At that point, Officer Cowick stretched the stop out further by circling back to the subject of proof of insurance. That tactic succeeded in prolonging the stop just long enough for the dog to arrive, sniff, and alert.

Despite the evidence of delay, the majority affirms the denial of Gholston's motion to suppress primarily by deferring to the district court's factual finding that Officer Cowick's late request for insurance information was the result of an "innocent mistake." I respectfully dissent. Even if the mistake was honest, it still unreasonably prolonged the stop. And with respect, that finding of an "innocent mistake" was clearly erroneous. This elementary and convenient "mistake" provided the only rationale for continuing to detain Gholston until the dog arrived. Other judges finding facts in such cases can and should be more skeptical about such tactics to prolong pretextual traffic stops.

Police often use a trivial traffic infraction to justify a traffic stop that metamorphoses into an opportunity to investigate other possible crimes, especially drug trafficking. The Supreme Court has held that such a stop does not violate the Fourth Amendment if the police officer has probable cause to believe the driver violated a traffic law, regardless of the officer's real motive. *Whren v. United States*, 517 U.S. 806, 813 (1996). The Court has imposed important limits on this police tactic, especially in terms of limited time and purposes. A seizure that is lawful at its inception can violate the Fourth Amendment if it is prolonged beyond the time reasonably required to complete the initial mission of the stop. *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).

In *Rodriguez v. United States*, 575 U.S. 348 (2015), the Court provided its most detailed guidance to date on these limits. The Court explained that a "police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Id.* at 350. During a traffic stop, the police officer must stick to the "mission" of the seizure: ensuring road safety, "determining whether to issue a traffic ticket, ... checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id*. at 355.

If those activities and the officer's observations provide reasonable suspicion about criminal activity sufficient to detain the subject against his will—that's usually the aim of the pretextual stop in the first place—the officer may then act appropriately. But an officer may not prolong the stop, "absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id*.; accord, e.g., *United States v. Cole*,

994 F.3d 844, 853 (7th Cir. 2021), *rehearing en banc granted* (June 9, 2021). *Rodriguez* held that lower courts may not shrug off delays as "de minimis" when the subject is being detained against his will. 575 U.S. at 356–57 (rejecting "de minimis" rule applied by circuit court).

Applying these general rules to this case, Officer Cowick's stop of Gholston for the turn-signal infraction departed from his legitimate constitutional mission in a couple of respects. He spent several of the first minutes of the stop not on traffic matters but on handcuffing Gholston, obtaining his consent to a search of his person, carrying out the search, and unsuccessfully trying to convince Gholston to consent to a search of his vehicle.

After Officer Cowick got around to his legitimate purposes, in which he had zero interest, he completed the warning ticket for the turn-signal infraction at 12:32 am. At that time, the drug-sniff by a police dog that was Officer Cowick's real goal was not yet possible. The dog and his handler were still on their way, so Gholston should have been free to go on about his business. Officer Cowick's testimony made clear, though, that he simply was not going to let Gholston leave before the dog could arrive for a sniff of the vehicle. Further detention for that purpose violated the Fourth Amendment unless Officer Cowick had some other legitimate basis to restrain Gholston's liberty. He did not.

The government and police officers have offered three theories for continued detention: reasonable suspicion of drug trafficking; a de facto policy of detention to serve a "Notice of Violation" on a parking infraction; and Officer Cowick's belated pivot to proof of insurance. None of these theories should save this deliberately prolonged traffic stop.

*Reasonable Suspicion*: Officer Cowick was interested in Gholston based on a stale tip. A meth user who occasionally provided Officer Cowick with information of unknown reliability had told him that Gholston was selling meth from his truck. The tip was at least three and a half months old, and Officer Cowick admitted that he had never used any information from the tipster to arrest anyone or to obtain a search warrant. Tr. 50. Officer Cowick said that he had heard the same from other people on the street, but he could not identify any other sources and had never even made a note of them. The vague, stale, and uncorroborated tips gave Officer Cowick his motive to stop Gholston for the turn-signal infraction, but they fell well short of the reasonable suspicion needed to restrain a person's liberty. Nothing that occurred during the traffic stop, until the delayed dog-sniff, added enough to those tips to justify detaining Gholston.[1]

*The Parking Infraction*: After Officer Cowick had handcuffed and searched Gholston, he finally checked the driver's license information with a dispatcher. He was told that Gholston was the subject of a "Notice of Violation" in the Quincy police files. Officer Cowick claimed that he had authority to detain Gholston until another officer delivered that notice from headquarters to the traffic stop. And the need/opportunity to wait for delivery of the notice was the reason Officer Cowick repeatedly told the officer making the delivery to "take your time" while at the same time urging the handler

---

[1] There is a minor factual dispute about how quickly Gholston realized Officer Cowick was stopping him; Gholston was already out of his truck and walking away before the officer turned on his red and blue lights. But once Officer Cowick had Gholston's attention, he was entirely cooperative.

of the drug-sniffing dog to hurry. Cowick testified at the hearing that he was not going to let Gholston go anywhere until the notice was delivered to the scene. Tr. 45, 83.

The federal government does not defend this rationale. Such notices are not arrest warrants. None of the officers offered any legal basis for this practice of detaining drivers to serve such notices on them, and none exists. The government stipulated that there was nothing in the police department's policy and procedures manual regarding this practice of holding motorists until such notices could be served. Tr. 163–64.

*Proof of Insurance*: Officer Cowick had all the information he needed to prepare the turn-signal warning by 12:22 am. Tr. 83. Even with all his texting, he finished and printed the warning ticket for the turn-signal violation at 12:32 am. He knew then that the canine officer and the drug-sniffing dog were on their way from a location six or seven miles away. According to Officer Cowick, *only then* did he realize he had not checked whether Gholston had proof of insurance for his vehicle. At 12:33, he asked Gholston for proof of insurance, which Gholston did not have in the vehicle. The officer then began preparing another ticket for violating the state law requiring proof of insurance in the vehicle. This took four more minutes. At 12:37 am, Cowick was working on the proof-of-insurance ticket as the drug-sniffing dog arrived. Within thirty seconds of arrival, the dog alerted on the vehicle. Officer Cowick was still printing the ticket.

The magistrate judge and district judge both found that Cowick's failure to ask for insurance initially was "an innocent mistake" rather than a ploy to prolong the pretextual traffic stop until the dog could arrive. The majority accepts

that finding as decisive and not clearly erroneous. With respect, I disagree on both points.

*Rodriguez* adopted an objective standard: the stop may "last no longer than is necessary to effectuate" the purpose that justified it. 575 U.S. at 354, quoting *United States v. Sharpe*, 470 U.S. 675, 684 (1985). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id*., citing *Sharpe*, 470 U.S. at 686. *Rodriguez* does not require perfect efficiency, but Officer Cowick's "innocent mistake" did not extend the time objectively necessary to complete his legitimate tasks that justified detaining Gholston.

Even if such an "innocent mistake" could justify a prolonged stop, despite *Rodriguez*, the evidence of pretext and deliberate delay here was unusually strong. How else to interpret Cowick's texts telling the canine officer to hurry up—texting him to "drive fast" and that he could "guarantee" there was "a good amount"—while telling the officer with the Notice of Violation to "take your time!" Officer Cowick started with handcuffing, a frisk, another personal search, and an attempt to convince Gholston to consent to a vehicle search. And as noted, Officer Cowick virtually admitted to the deliberate delays when he testified more generally that "this is not how we typically do a traffic stop." Tr. 81.

*Rodriguez* listed checking proof of insurance as one of just a handful of routinely legitimate subjects for pretextual traffic stops. 575 U.S. at 355. Officer Cowick testified that at the beginning of the stop, he was so focused on the possibility of drugs and his supposed difficulty in getting Gholston's attention that he just forgot to ask about insurance.

This was a highly improbable oversight. "License, registration, insurance" is an absolutely routine and elementary step at the start of any traffic stop. We are supposed to believe that Officer Cowick remembered the first two and just happened to forget the third?

"Forgetting" to ask about insurance can work too easily to justify prolonged pretextual stops, at least if judges are willing to believe the excuse. We encountered the same "forgetfulness" recently in *United States v. Cole*, 994 F.3d at 853, where the officer making the pretextual stop did not ask for insurance information until at least fifteen minutes into the stop and after he had called for a drug-sniffing dog. (*Cole* was decided on other grounds.) For other recent examples of similar delays in pretextual stops, see *United States v. Byron*, 817 Fed. App'x 753, 755 (11th Cir. 2020) (delayed request for insurance information; affirming suppression on other grounds where officer prolonged traffic stop without justification); *Matthews v. Las Vegas Metro. Police Dep't*, 2021 WL 356235, *2 (D. Nev. Feb. 1, 2021) (officer requested insurance information fifteen to twenty minutes after start of traffic stop); *United States v. Bullock*, 2020 WL 5553562, *13 (N.D. Iowa Aug. 21, 2020) (officer delayed requesting insurance information; motion to suppress denied on other grounds; presence of firearms in car and questions about permits for them gave officers good reasons not to focus on insurance).

A few instances of pretextual stops with delayed requests for insurance information do not prove this is a common tactic for prolonging such stops. Maybe it's just a coincidence that the officers in *Cole* and this case happened to make the same convenient mistake. Yet the effects of such a delay in accomplishing the real purpose of a pretextual stop call for judges

to be less credulous. I read the majority opinion's reliance on the standard of review as signaling that a different finding by the trial court on the delayed insurance request would also have been affirmed here. With respect, though, I believe we should reverse here.