In the

# United States Court of Appeals

## For the Seventh Circuit

No. 20-3188

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

WILLIAM A. GOODWILL,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 18-cr-20025 — **Sue E. Myerscough**, *Judge.*

ARGUED OCTOBER 26, 2021 — DECIDED JANUARY 21, 2022

Before FLAUM, ST. EVE, and KIRSCH, *Circuit Judges.*

ST. EVE, *Circuit Judge*. Detectives Johnathan Roseman and Matthew Hunt stopped William Goodwill for a window tint violation. After asking Goodwill to sit in the squad car, Roseman began completing the paperwork while both detectives asked Goodwill some questions. A canine unit arrived minutes later, before Roseman had finished filling out the warning form. The dog alerted to the presence of drugs, and a search revealed two kilograms of cocaine.

A grand jury indicted Goodwill on one count of posses-
sion of cocaine with intent to distribute. Goodwill moved to
suppress the drugs, arguing that the officers unlawfully pro-
longed the search by asking unrelated questions and con-
ducted the dog sniff without his consent. The district court
found that the questions posed to Goodwill did not extend the
stop and denied the motion to suppress. Goodwill now ap-
peals. We conclude that the district court did not clearly err
and therefore affirm.

## I.

Detectives Roseman and Hunt observed Goodwill driving
a white Ford Edge with windows tinted noticeably darker
than allowed by Illinois law. They trailed behind him for
about a minute. Goodwill then crossed over the fog lines bor-
dering the exit ramp and headed to a rest stop. The detectives
followed. Before beginning the stop, Roseman relayed the de-
tails to dispatch, which sent a notice to all marked units, in-
cluding Detective Chad Larner, a canine unit operator, who
started driving toward the scene.

At 1:58 p.m., the detectives initiated the traffic stop. Detec-
tive Roseman exited his car, approached Goodwill, and re-
quested his driver's license and insurance. He then asked
Goodwill to come sit in his squad car while he processed the
paperwork. Goodwill agreed. Once Goodwill sat down in the
police car, Detective Roseman performed a "records check"
through the Secretary of State and the Law Enforcement
Agencies Data System ("LEADS"). This check requires an of-
ficer to submit the motorist's name, birth date, and driver's
license. Throughout the encounter, Detective Roseman asked
Goodwill questions about his car, the weather, his child, the

length of his stay in the area, any plans for his time there, and his driving history.

At 2:02 p.m., Roseman received confirmation from LEADS and the Secretary of State that Goodwill's information was accurate. One minute later, Roseman began filling out the hardcopy of the written warning with the date and time; the year, make and model of the car; Goodwill's name, birth date, address; the traffic violation; and the location of the stop. While writing the warning, Roseman continued chatting with Goodwill. He asked what Goodwill did for a living, how he enjoyed his job, what gift he had purchased for his child, how long his friend had been driving the car, how long he had known the owner, and whether he had taken any drugs or medications. Hunt also chimed in and questioned Goodwill about the toys in his trunk. During this time, one of the detectives had also messaged the canine unit to hurry.

At 2:07 p.m., Larner arrived with a drug dog. One minute later, before completing the warning, Roseman asked Goodwill if he would consent to the drug dog sniffing around his car. Goodwill agreed four times to allow the search. Roseman then returned to writing up the warning while Larner walked around the car with the drug dog. The dog alerted to the presence of illegal drugs. The officers searched the car and found two kilograms of cocaine.

A grand jury charged Goodwill with one count of possession with the intent to distribute at least 500 grams of cocaine. *See* 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(ii). Goodwill moved to suppress the evidence gathered from the traffic stop. The magistrate judge recommended denying the motion; the district court judge accepted the recommendation and denied the motion. Goodwill entered a conditional guilty plea and

reserved the right to appeal the denial of his suppression motion. The district court sentenced Goodwill to 120 months of imprisonment, followed by eight years of supervised release.

## II.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Lange v. California*, 141 S. Ct. 2011, 2017 (2021) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). Goodwill argues that the government violated the Fourth Amendment by unlawfully prolonging the traffic stop and conducting a search without his consent. We review the district court's factual findings for clear error and its legal conclusions de novo. *United States v. Gholston*, 1 F.4th 492, 496 (7th Cir. 2021).

## A.

Stopping a vehicle is a seizure under the Fourth Amendment. *United States v. Cole*, 21 F.4th 421, 427 (7th Cir. 2021) (en banc). Traffic stops are similar to *Terry* stops and must be supported by reasonable suspicion. *Id.* Goodwill concedes that the detectives lawfully initiated the traffic stop. He contends, however, that Roseman could not ask Goodwill to relocate to the squad car while the paperwork was being processed, and that the detectives prolonged the stop by asking questions unrelated to the traffic offense. We take each argument in turn.

## 1.

A police officer can ask a driver to sit in the police car for the duration of a traffic stop without any particularized suspicion of dangerousness. *See United States v. Lewis*, 920 F.3d

483, 492 (7th Cir. 2019) (holding that requests to move into a squad car are "reasonably incidental" to the traffic stop); *United States v. Baker*, 78 F.3d 1241, 1244 (7th Cir. 1996) ("Once Brophy stopped Baker, the trooper could legitimately ask him to step out of his car, even without any particularized suspicion that Baker possessed a weapon."); *cf. Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977). Officers reasonably fear for their safety during traffic stops—a driver can have a hidden weapon and passing traffic endangers a police officer standing close to a major highway—and vehicle occupants are minimally burdened by moving. *See Mimms*, 434 U.S. at 111. Therefore, Roseman lawfully asked Goodwill to move to his squad car while he was completing the written warning.

Goodwill claims that Roseman lacked a "reasonable justification" for asking him to move to the squad car because Roseman did so, in part, to dispel "negative views of the police." Putting aside the fact that Roseman made the request primarily because of officer safety, "outside the context of inventory search or administrative inspection," the Supreme Court has rejected the proposition that an "officer's motive invalidates objectively justifiable behavior under the Fourth Amendment." *Whren v. United States*, 517 U.S. 806, 812 (1996). Because Roseman's request to Goodwill was objectively reasonable, we do not inquire into his subjective motives.

**2.**

A traffic stop can last only long enough to complete the "mission" of the stop, that is, "to address the traffic violation that warranted the stop and attend to related safety concerns." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015); *see also Cole*, 21 F.4th at 428. Once officers have completed every traffic-related task, the motorist cannot be detained any

longer without reasonable suspicion of other criminal activity. *United States v. Lopez*, 907 F.3d 472, 486 (7th Cir. 2018). Officers may, though, investigate unrelated matters that do not prolong the stop "beyond the time reasonably required to complete th[e] mission." *Rodriguez*, 575 U.S. at 354–55 (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005); *see also Arizona v. Johnson*, 555 U.S. 323, 333 (2009) ("An officer's inquiries into matters unrelated to the justification for the traffic stop … do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop."). The government acknowledges that the detectives asked Goodwill questions unrelated to the "mission" of the stop but maintains that these inquiries did not prolong the stop.

Whether unrelated questioning prolongs a stop is a factual issue that we review for clear error. *See United States v. Gholston*, 1 F.4th 492, 496 (7th Cir. 2021) (crediting the district court's finding that the officer speaking with the passenger about possible drugs, calling, sending messages, and urging a canine unit to arrive did not lengthen the traffic stop); *United States v. Malone*, 10 F.4th 1120, 1124 (10th Cir. 2021) ("The critical issue is thus whether the alleged detour prolonged the traffic stop. This question is factual, not legal."); *see also United States v. Medina*, 969 F.3d 819, 821 (7th Cir. 2020) ("We do not reweigh evidence or reassess witness credibility …."). A trial judge is better positioned to evaluate the witness testimony of the detectives and determine whether their actions amounted to good-faith questioning or impermissible stalling. The district court found that Roseman worked "diligently" on the warning as he was asking questions; while conversing with Goodwill, Roseman continued to write the warning, look

through information on the police computer, or request additional information. We see no clear error in these findings.

Indeed, the record supports the district court's findings. Filling out a warning requires a verification and physical write-up. Roseman needed to check the driver's license and vehicle information—which involved typing in the motorist's name and date of birth or driver's license number along with the vehicle's registration information—then complete, by hand, the warning itself—which included the date, time, and vehicle information (including year, make, and model); the driver's information, such as name, birth date, current address; and the location of the traffic stop. Both Roseman's testimony at the suppression hearing and the traffic-stop video indicate that he worked expeditiously.

Goodwill submits that Roseman could have completed the task in less time. Once Roseman received confirmation regarding Goodwill's license and vehicle information at 2:02 p.m., he believes, Roseman could have written the ticket before the canine unit arrived five minutes later. Instead, the detectives spent several minutes asking questions "wholly unrelated to the traffic violation," as Roseman was spitting tobacco into a can, looking at Goodwill while questioning him, and checking his surroundings. When Roseman finally completed the warning, he checked the wrong offense. Goodwill's position, however, proves unconvincing. An officer can ask "wholly unrelated" questions while processing a ticket.[1] *See,*

---

[1] Goodwill suggested for the first time at oral argument that an officer can ask unrelated questions only while waiting to receive information back from the computer system. Then once this confirmation comes, the officer must finish the warning or ticket without speaking to the motorist. We disagree. Unrelated inquiries are permissible if they "do not measurably

*e.g.*, *Johnson*, 555 U.S. at 333; *United States v. Walton*, 827 F.3d 682, 687 (7th Cir. 2016). The information did return from the databases a few minutes into the stop, but Roseman still needed to transcribe everything from the computer to the ticket itself, which entailed handwriting each input from different computer screens. There is nothing suggesting that simply spitting or looking up while engaged in this process unconstitutionally extends a stop. And the small error on the warning was an insignificant mistake.

Goodwill further asserts that "it is essential to view" the case with the knowledge that a canine unit was rushing to the scene and that one detective, immediately when the databases returned the necessary information to complete the ticket, messaged Larner to hurry. But additional units can arrive during a traffic stop and walk a drug-sniffing dog around a car—again—as long as the process does not prolong the stop. *See Rodriguez*, 575 U.S. at 355.

Finally, our recent opinion in *United States v. Gholston* guides this outcome. There, Officer Cowick "long suspected" that Gholston was dealing methamphetamine from his truck. *Gholston*, 1 F.4th at 494. He pulled over Gholston's truck for a pretextual traffic violation. *Id.* Then several delays occurred: the officer searched Gholston for two minutes; he forgot Gholston's proof of insurance, so had to ask again for it; he spoke with two other officers about his suspicion that Gholston had drugs; and while sending messages to the other officers, he switched screens repeatedly. *Id.* at 496–97. "Given the deferential standard of review that applies to the

---

extend the duration of the stop," which encompasses the completion of a written form. *Johnson*, 555 U.S. at 333.

underlying facts," we nonetheless concluded that there was "no reversible error." *Id.* at 497. In contrast to Cowick, Roseman worked on the ticket continuously without any breaks to search Goodwill, ask for his insurance again, or switch screens on his computer. Thus, as in *Gholston*, we see no reversible error in the district court's factual findings.

**B.**

An officer does not need a driver's consent to conduct a dog sniff during a lawful traffic stop, if it does not prolong the stop. *Caballes*, 543 U.S. at 409. Given that the detectives were still processing the paperwork when the canine unit arrived, they did not need Goodwill's consent to conduct the search.

**III.**

For these reasons, we affirm the judgment of the district court.