In the

# United States Court of Appeals

## For the Seventh Circuit

No. 20-3063

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JOSE ARMANDO OCHOA-LOPEZ,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Western Division.
No. 18-CR-50013-2 — **Philip G. Reinhard**, *Judge.*

ARGUED NOVEMBER 1, 2021 — DECIDED APRIL 20, 2022

Before HAMILTON, SCUDDER, and ST. EVE, *Circuit Judges.*

ST. EVE, *Circuit Judge.* Agents investigating a suspected drug dealer, Tervarie Lottie, and his supplier learned that the two men agreed to a large heroin purchase. The supplier, who had recently suffered a leg injury, planned to arrive at a location in Rockford, Illinois to complete the transaction. Lottie prepared for the deal: he went to two houses where he stashed drugs and money before returning to his residence. Shortly after, a white Corolla pulled into his driveway for ten to

fifteen minutes before leaving. Law-enforcement officers followed the car and pulled it over after observing two traffic violations. Jose Armando Ochoa-Lopez was the driver, and the suspected supplier was the passenger. One officer noticed that the passenger had a leg injury that required the use of an assistive device. Ochoa-Lopez claimed the two men were just transporting the car for a company. The agents searched the vehicle and discovered a Louis Vuitton backpack containing over $47,000 in cash.

A grand jury indicted Ochoa-Lopez on drug charges, and Ochoa-Lopez filed a motion to suppress the evidence recovered during the warrantless search of the car. After conducting a two-day evidentiary hearing, the district court concluded the search of the car was constitutional and denied the motion. Because the agents had probable cause to search the car, we affirm.

## I. Background

This case arises from a lengthy investigation into drug trafficking activities carried out between Lottie and his coconspirators. Beginning in February 2017, the Federal Bureau of Investigation ("FBI") conducted extensive surveillance on Lottie, made more than ten controlled purchases of heroin from Lottie and another coconspirator, and secured two court orders authorizing the interception of wire and electronic communications to and from Lottie's cellphone.

Three times in late October, agents intercepted calls between Lottie and Johnia Wilson, a suspected middleman, where Wilson told Lottie about someone interested in buying narcotics. Lottie reached out to his supplier, agreed to purchase the heroin, and arranged a meeting on October 27, 2017.

Lottie then contacted Wilson to confirm he would have heroin for the deal. Minutes later, the supplier informed Lottie that he was trying to find someone to drive him to the rendezvous location because he had a significant leg injury and that he wanted to drive to Lottie's "doorstep" to "run a test" on the heroin. Lottie responded that he would "have somebody with me" to test the heroin.

On the morning of the planned transaction, the supplier called Lottie and explained that his driver had failed to arrive at the scheduled 9:00 a.m. meeting time, so the supplier was going to head to Lottie alone. Because of his leg pain, however, he planned on taking a break. He reassured Lottie though that he was "on [his] way right now" with a half-kilogram of heroin and asked for an address. He added, "I'm in my crutches so I'm going to be just trying to push it." Lottie texted him an address on the other side of town from Lottie's residence.

Throughout the day, law-enforcement officers had Lottie under constant surveillance. Lottie went to his "trap house," the location where he stored narcotics, travelled to his grandparents' house, where he stored money, then drove to the address that he previously texted to his supplier. There, a man came out of the residence, entered Lottie's car briefly, returned to the residence, then came back out. The two drove to Lottie's residence. Shortly after, a white Toyota Corolla with an Indiana license plate arrived. The car sat there for about ten to fifteen minutes and then left.

Two law-enforcement officers, Task Force Officer ("TFO") Ryan Heavin and Winnebago County Sheriff's Deputy Fred Jones, followed the Corolla. They saw the driver commit two traffic offenses—failing to use a turn signal and improper lane

usage—and pulled them over. Deputy Jones approached the driver's side, as TFO Heavin moved toward the passenger's side. Two people were in the car: a driver, Ochoa-Lopez, and a passenger, the suspected supplier. TFO Heavin saw that the passenger had a cast or something similar on his leg. Deputy Jones informed Ochoa-Lopez of his traffic violations and asked both men to exit the vehicle. The passenger's leg was injured, and he needed the use of an assistive device, a walker, stored in the trunk. Ochoa-Lopez claimed that he and the supplier worked for a transport company and were transporting a vehicle they had just picked up. TFO Heavin knew the Corolla had just stopped at Lottie's residence, which meant that Ochoa-Lopez likely fabricated the transport-company story. Deputy Jones then searched the Corolla and found a Louis Vuitton backpack with $47,000 in cash.

A grand jury indicted Ochoa-Lopez with conspiracy to distribute and distribution of 100 grams or more of heroin. *See* 21 U.S.C. §§ 841(a)(1), 846. Ochoa-Lopez filed a motion to suppress the evidence recovered during the stop and search of the Corolla. The district court held a two-day evidentiary hearing and determined that probable cause supported the warrantless search of the car.[1] Ochoa-Lopez entered a conditional guilty plea reserving the right to appeal the denial of his suppression motion. The district court sentenced him to

---

[1] Ochoa-Lopez concedes on appeal the agents had reasonable suspicion for the initial traffic stop. *See United States v. Cole*, 21 F.4th 421, 427 (7th Cir. 2021) (en banc) ("Because traffic stops are typically brief detentions, more akin to *Terry* stops than formal arrests, they require only reasonable suspicion of a traffic violation—not probable cause.").

sixty months' imprisonment, followed by four years' super-
vised release.

## II. Discussion

Ochoa-Lopez argues the government agents lacked prob-
able cause to search the Corolla. We review the district court's
legal conclusions de novo and its factual findings for clear er-
ror. *United States v. Goodwill*, 24 F.4th 612, 615 (7th Cir. 2022).

The Fourth Amendment guarantees "[t]he right of the
people to be secure in their persons, houses, papers, and ef-
fects, against unreasonable searches and seizures … and no
warrants shall issue, but upon probable cause …." U.S. Const.
amend. IV. Warrantless searches "are *per se* unreasonable un-
der the Fourth Amendment—subject only to a few specifically
established and well-delineated exceptions." *Arizona v. Gant*,
556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S.
347, 357 (1967)). One exception is the "automobile exception,"
which permits an officer to search a vehicle without a warrant
if the search is supported by probable cause. *United States v.
Kizart*, 967 F.3d 693, 695 (7th Cir. 2020); *see also United States v.
Blaylock*, 535 F.3d 922, 926 (8th Cir. 2008) (outlining the ration-
ales for the automobile exception: the quick-moving nature of
cars, the relative openness of the space, and the pervasive reg-
ulation of vehicles on open highways). Probable cause exists
"when, based on the totality of the circumstances, 'there is a
fair probability that contraband or evidence of a crime will be
found in a particular place.'" *United States v. Sands*, 815 F.3d
1057, 1063 (7th Cir. 2015) (quoting *Illinois v. Gates*, 462 U.S. 213,
238 (1983)).

The agents had probable cause to believe the Corolla con-
tained evidence of criminality. The FBI had been investigating

Lottie, a drug dealer, for several months and had him under constant surveillance the day of the transaction. They knew in advance that Lottie's supplier was coming to Rockford for a drug deal, that he was scheduled to arrive by noon, that Lottie planned to have someone with him to test the quality of the heroin, and significantly, that the supplier had a leg injury. The Corolla then arrived at Lottie's residence—after Lottie had just been to two houses where he stored money and drugs—and remained there for ten to fifteen minutes, long enough to complete a narcotics transaction. The vehicle departed toward the Chicago area, from where Lottie's supplier had traveled. After TFO Heavin and Deputy Jones pulled over the car, TFO Heavin observed the passenger had a leg injury that required the use of an assistive device, indicating that he was the supplier on the phone calls with Lottie. Ochoa-Lopez, the driver of the car, then told the agents that he and the supplier were transporting a vehicle for a company, but the agents knew that story was untrue. Under the totality of the circumstances, these facts establish a "fair probability" that the car contained "contraband or evidence of a crime." *Id.*

Ochoa-Lopez contends that probable cause was lacking because of discrepancies between the planned transaction and the events that occurred: the car did not travel to the address Lottie had texted the supplier; the supplier told Lottie that he would be driving by himself and that he was using crutches, not a walker; and the car had an Indiana license plate even though agents believed the supplier lived in the Chicago area. But the agents knew that Lottie was using an additional form of communication that was not subject to the interception orders, and that Lottie communicated with his supplier after sending the address to him. The supplier, too, originally planned to have someone drive him to the location, and

although he indicated he might need to drive up himself, the agents could reasonably infer that he found someone to assist him. This inference was especially reasonable in light of TFO Heavin's observation that the passenger had sustained a leg injury, requiring the use of an assistive device. And an officer could assume that someone travelling from the Chicago area might have a license plate from a neighboring state; not every resident living in the Chicago area has Illinois license plates. Thus, any discrepancies do not negate probable cause.

Ochoa-Lopez places undue reliance on *United States v. Ingrao*, 897 F.2d 860 (7th Cir. 1990), and *United States v. Bohman*, 683 F.3d 861 (7th Cir. 2012), both of which are inapposite. In *Ingrao*, the suspect walked down a gangway shared by at least two houses, carrying a black bag. 897 F.2d at 863. Besides the use of the same walkway though, there was "no connection between Ingrao and any of the alleged criminal activities." *Id.* Similarly, in *Bohman*, the suspect simply left a suspected location of drug activity, which was alone insufficient to give a police officer reasonable suspicion to stop the car. 683 F.3d at 864–65. Here, in contrast, additional facts beyond mere presence around suspected illegal activity support probable cause. The car arrived at a place of suspected illegal activity right after Lottie likely gathered the drugs and money. The agents knew that a supplier with a leg injury was coming to meet Lottie for a drug deal, and after pulling the car over, TFO Heavin immediately noticed that the passenger had suffered such a leg injury. Finally, upon questioning, Ochoa-Lopez, himself, fabricated an inconsistent story.

### III. Conclusion

In sum, the agents had probable cause to search the vehicle Ochoa-Lopez was driving—that is, based on the totality of the

circumstances, there was a "fair probability that contraband or evidence of a crime" would be found there. *Sands*, 815 F.3d at 1063. For these reasons, we affirm the judgment of the district court.