In the

# United States Court of Appeals
## For the Seventh Circuit

No. 24-1787

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MARTIN DEVALOIS,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Indiana, South Bend Division.
No. 3:21-cr-00052-DRL-MGG-1 — **Damon R. Leichty**, *Judge.*

ARGUED NOVEMBER 12, 2024 — DECIDED FEBRUARY 14, 2025

Before SYKES, *Chief Judge*, and BRENNAN and ST. EVE, *Circuit Judges*.

BRENNAN, *Circuit Judge*. Police stopped Martin Devalois and a travel companion for a traffic violation. During the stop, a drug-sniffing dog alerted to narcotics in Devalois's rental vehicle. Rather than comply with a request to exit the car, Devalois initiated a high-speed chase that ended in a crash. Police searched the vehicle and found a small amount of marijuana as well as a gun.

Devalois was charged with illegally possessing a firearm as a felon. He moved to suppress the gun, arguing police unconstitutionally prolonged the traffic stop to conduct a dog sniff. The district court denied his motion, and a jury found him guilty. On appeal, Devalois again contests the admission of the gun into evidence at trial.

**I**

The facts that follow are based on evidence presented at the suppression hearing, including testimony from LaPorte County Sheriff's Deputy Jon Samuelson—which the district court found "credibly precise." *See United States v. Gholston*, 1 F.4th 492, 497 (7th Cir. 2021) (deferring to the district court's credibility determinations).

Samuelson stopped a Toyota Highlander sport utility vehicle driving westbound on U.S. Highway 20 near Rolling Prairie, Indiana, for following too closely behind a semi-truck. After the vehicle pulled to the side of the road at around 10 a.m., Samuelson approached the passenger-side door. Devalois was seated closest to Samuelson, while a woman was in the driver's seat.

Samuelson requested the woman's license and registration. She told him the Highlander was a rental from Illinois and that, although she did not have a paper copy of the rental agreement with her, she might have a digital copy on her phone. Consistent with police practice, Samuelson invited the woman to sit in his squad car so she could search for the agreement there. *See United States v. Ambriz-Villa*, 28 F.4th 786, 790 (7th Cir. 2022) (explaining that an officer may ask a driver to sit in his patrol car while he prepares a ticket). She agreed.

The woman sat in the squad car's passenger seat. Samuelson's trained narcotics canine, Bosco, was in the back. While the woman tried to find the rental agreement, Samuelson checked her driver's license. Such a check will reveal the validity of a license and any warrants out for the driver's arrest. Samuelson also searched for the Highlander's license plate in the Illinois fleet system—a program that, among other things, indicates whether a vehicle is stolen and provides officers with information pertinent to writing a citation. But the fleet system ran slowly. As Samuelson waited for a return, he noticed the woman was trembling and nervous. He asked where she and Devalois were traveling from, and she told him South Bend. She also informed him she could not find the rental car agreement.

Without the rental agreement or information from the fleet system, Samuelson walked back to the Highlander and asked Devalois for the vehicle's registration. While Devalois searched for the registration, Samuelson also asked him where the pair was driving from. Like the woman, Devalois said South Bend. Samuelson followed up, asking how long they had been there. Devalois, upset with the number of questions, responded to the officer with profanity. Eventually, he located the registration, and gave it to Samuelson, who took it back to his squad car.

At that point, Samuelson had what he needed to begin writing the warning. The woman, still seated in the squad car, continued to appear nervous. To calm her down, Samuelson told the woman he was only issuing a warning. Because she remained anxious, he asked her several questions, including whether there were drugs or other contraband in the

Highlander. The woman responded in the negative, but Sam-uelson still asked if he could search the car. She said no.

Four minutes after Samuelson stopped the Highlander, Deputy Corey Chavez arrived to assist with the traffic stop. Samuelson told Chavez that he was preparing a warning be-cause the woman had been following too closely behind a semi-truck. He passed the warning to Chavez to complete and then let Bosco out of the squad car to conduct a dog sniff around the exterior of the Highlander. When Devalois real-ized what was happening, he became "irate."

About six minutes after Samuelson's initial contact with Devalois and the woman, Bosco alerted to the presence of nar-cotics in the rental vehicle. Samuelson returned Bosco to his squad car and informed Chavez, who was still working on the warning ticket, about the positive alert. Samuelson returned to the Highlander and asked Devalois to step out. When he refused, Samuelson called Chavez for backup. Devalois then slid from the passenger's seat to the driver's seat, prompting both officers to draw their weapons. Devalois sped off, and a hot pursuit ensued.

Throughout the chase, officers observed Devalois throw-ing items out of the vehicle. After about thirty minutes, police finally apprehended Devalois, who had crashed the rental car into a snowbank. Following his arrest, officers searched the Highlander and found a handgun as well as some marijuana. They also discovered a magazine for the handgun in the vehi-cle's trunk.

Devalois, a convicted felon, was charged with illegally possessing a firearm in violation of 18 U.S.C. § 922(g)(1). He moved to suppress the handgun, arguing police obtained it

only after Samuelson prolonged the traffic stop to conduct a dog sniff in violation of the Fourth Amendment. The district court held a suppression hearing, and Samuelson testified to the facts above. Based in large part on his testimony, the district court denied Devalois's motion, finding that Samuelson did not extend the length of the stop. The case proceeded to trial, and a jury found Devalois guilty on the gun charge. The district court sentenced him to 92 months' imprisonment. He timely appeals, challenging the denial of his motion to suppress.

## II

Devalois renews his contention that police violated his Fourth Amendment rights by prolonging the traffic stop to conduct a dog sniff. As a result, he claims the district court should have refused to admit into evidence the gun police later seized from his rental vehicle.[1] Although Devalois does not directly invoke it, he seems to rely on the exclusionary rule, which "requires trial courts to exclude unlawfully seized evidence in a criminal trial." *Utah v. Strieff*, 579 U.S. 232, 237 (2016). The rule bars the admission of "'evidence obtained as a direct result of an illegal search or seizure' and, relevant here, 'evidence later discovered and found to be derivative of an illegality.'" *Id.* (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)).

---

[1] Neither party raised the issue, but we note the Supreme Court has held "that, as a general rule, someone in otherwise lawful possession and control of a rental car has a reasonable expectation of privacy in it even if the rental agreement does not list him or her as an authorized driver." *Byrd v. United States*, 584 U.S. 395, 398–99 (2018).

Where, as here, we are "evaluating the denial of a motion to suppress, we review the [district] court's factual findings for clear error, while legal conclusions and mixed questions of law and fact are reviewed de novo." *United States v. Yang*, 39 F.4th 893, 899 (7th Cir. 2022) (citing *Gholston*, 1 F.4th at 496).

The Fourth Amendment protects persons against unreasonable searches and seizures. U.S. CONST. amend. IV. "[T]he ultimate touchstone … is reasonableness." *United States v. Cole*, 21 F.4th 421, 427 (7th Cir. 2021) (en banc) (quoting *Lange v. California*, 594 U.S. 295, 301 (2021)). Because traffic stops constitute "seizure[s]" of "persons," they are subject to this reasonableness standard. *Whren v. United States*, 517 U.S. 806, 809–10 (1996). A constitutionally reasonable traffic stop may last no longer than what is necessary for officers to complete their "mission." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). "Authority for the seizure thus ends" when the mission is "or reasonably should have been" accomplished. *Id.* (citing *United States v. Sharpe*, 470 U.S. 675, 686 (1985)).

Broadly speaking, the mission of a traffic stop involves "address[ing] the traffic violation that warranted the stop and attend[ing] to related safety concerns." *Id.* (internal citations omitted). Police may check the driver's license, seek the vehicle's registration, request proof of insurance, and investigate whether there are warrants out for the driver's arrest. *Gholston*, 1 F.4th at 496 (citing *Rodriguez*, 575 U.S. at 355); *Yang*, 39 F.4th at 903. An officer may also ask the driver questions pertinent to the stop, including questions related to travel plans. *Cole*, 21 F.4th at 430.

Beyond this mission, police are free to engage in certain additional activities as long as they do "not prolong the traffic stop." *Id.* at 429; *Rodriguez*, 575 U.S. at 354 ("[T]he Fourth

Amendment tolerate[s] certain unrelated investigations that
d[o] not lengthen the roadside detention."). An officer may,
for instance, ask questions that have nothing to do with either
the traffic violation or safety matters. *Cole*, 21 F.4th at 429.
And, particularly relevant here, police may "even conduct a
dog sniff." *Id.*; *Rodriguez*, 575 U.S. at 354.

## A

The district court found, as a factual matter, that Samuel-
son did not prolong Devalois's temporary seizure to conduct
a dog sniff. *See Gholston*, 1 F.4th at 497; *see also United States v.
Goodwill*, 24 F.4th 612, 616 (7th Cir. 2022). "A factual finding is
clearly erroneous only if, after considering all the evidence,
we cannot avoid or ignore a definite and firm conviction that
a mistake has been made." *Yang*, 39 F.4th at 899 (quoting
*United States v. Burnside*, 588 F.3d 511, 517 (7th Cir. 2009))
(cleaned up).

The record here firmly supports the district court's find-
ing. While "we repeatedly have declined to adopt even a rule
of thumb" as to how long a reasonable stop may last, *Gholston*,
1 F.4th at 496, we note that about six minutes passed between
Samuelson's first contact with the driver and Bosco's alert. *See
id.* at 494–95 (concluding police did not unreasonably prolong
a stop when a dog sniff occurred more than fourteen minutes
after initial contact).

During that time, Samuelson diligently pursued tasks that
fell within the stop's mission. Indeed, many of his activities
were directly related to the objective of the stop: issuing a
warning for following too closely behind a semi-truck. *See
Yang*, 39 F.4th at 902–03. At the outset, Samuelson sought the
driver's license. He then began a license status check and ran

a search for the vehicle in the Illinois fleet system. When the driver could not produce the vehicle's rental agreement, Samuelson sought the registration card. Once he had the information he needed to write a warning, he began drawing one up. And although Devalois seems to suggest Samuelson's authority to continue the seizure ended then, he cannot be correct, as the officer still needed time to write the warning. *Rodriguez*, 575 U.S. at 354–55 (describing the mission of a traffic stop as embracing the time needed to "*issu[e]* a warning ticket") (emphasis added). All these tasks related to the stop's mission. *Cole*, 21 F.4th at 428–29.

Throughout the stop, Samuelson asked several questions, none of which, the district court found, prolonged it. That finding was not clearly erroneous. To start, Samuelson was free to ask from where Devalois and the woman were traveling. "[T]ravel-plan questions ordinarily fall within the mission of a traffic stop," as they "supply important context for the violation at hand." *Id.* at 429. Reasonable follow-up questions are permissible, too. *Id.* at 431. Samuelson also asked the woman a series of questions to find out if there were drugs or other contraband in the car. To be sure, those questions were unrelated to the traffic stop. But they did "not convert the encounter into something other than a lawful seizure" because Samuelson was still actively preparing the warning ticket. *Arizona v. Johnson*, 555 U.S. 323, 333 (2009). Moderate "question[ing] that do[es] not increase the length of the detention … do[es] not make the custody itself unreasonable." *United States v. Childs*, 277 F.3d 947, 949 (7th Cir. 2002) (en banc).

Nor, as Devalois argues, did Samuelson's decision to hand off the warning to Chavez render the seizure unreasonable. When Chavez arrived, Samuelson had filled out only a few

basic pieces of information on the warning—including the date and location of the violation, the woman's name, and some details about the vehicle. The district court found that the transfer of duties required only a brief officer-to-officer conference; it did not delay the stop. Given Samuelson's credible testimony on that point, this finding was not clearly erroneous either. And despite Devalois's position to the contrary, so long as the transfer of duties does not prolong a traffic stop, the officer who begins to write a citation need not be the one to complete it.

In the end, we agree with the district court's conclusion that, at all times during the encounter, Samuelson pursued the stop's mission with "diligence, not delay."

**B**

Because the record supports the finding that Samuelson did not prolong the traffic stop, the remaining legal question—whether the handgun should have been suppressed based on a Fourth Amendment violation—proves straightforward. The district court refused to preclude admission of the handgun at Devalois's trial, concluding it was not the fruit of an unlawful search or seizure. We review legal issues de novo. *Yang*, 39 F.4th at 899 (citing *Gholston*, 1 F.4th at 496).

When Samuelson ultimately conducted the dog sniff, Chavez was still preparing the warning. Authority for the seizure was thus ongoing. An officer may employ a drug-sniffing canine to search a vehicle's exterior without violating the Fourth Amendment while another officer continues to diligently pursue the mission of the stop. *Illinois v. Caballes*, 543 U.S. 405, 410 (2005). This remains true whether police have a reasonable suspicion that the vehicle contains drugs or not.

*United States v. Lewis*, 920 F.3d 483, 491 (7th Cir. 2019). Accordingly, Samuelson was free to conduct a dog sniff without violating Devalois's Fourth Amendment rights.

Bosco alerted Samuelson to the presence of narcotics in the vehicle. Devalois has not challenged Bosco's reliability, so the positive alert provided police with probable cause to believe the vehicle did, in fact, contain drugs. *United States v. Johnson*, 93 F.4th 383, 388–89 (7th Cir. 2024). And, although most warrantless searches "are per se unreasonable under the Fourth Amendment," *Katz v. United States*, 389 U.S. 347, 357 (1967), the automobile exception to the warrant requirement permits "authorities to search a car without a warrant if they have probable cause," *United States v. Jackson*, 103 F.4th 483, 486 (7th Cir. 2024) (citing cases). So, officers were permitted to search Devalois's rental car based on Bosco's positive alert, even without a warrant. Because that search was lawful, the district court was right to deny Devalois's motion to suppress its fruits—namely, the handgun.[2]

*                *                *

The district court found, as a factual matter, that Samuelson did not prolong Devalois's traffic stop to conduct a dog sniff. That was not clearly erroneous. Accordingly, police

---

[2] Because the automobile exception to the Fourth Amendment's warrant requirement justified the officers' warrantless search, we need not reach Devalois's cursory argument that police exceeded the search incident to lawful arrest exception by searching his rental car after he had been detained and could no longer access the vehicle. *See Arizona v. Gant*, 556 U.S. 332, 343 (2009) (explaining police may "search a vehicle incident to a recent occupant's arrest only when the arrestee is unsecured and within reaching distance of the passenger compartment" or when there is reason to believe the vehicle contains evidence of the crime of arrest).

uncovered Devalois's handgun as a result of a lawful search and seizure. The district court's decision denying his motion to suppress the gun is therefore AFFIRMED.